1
2
3
4
5
6
7
8
9
10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| 11 STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF WASHINGTON, STATE OF ARIZONA, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF ILLINOIS, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF NEW JERSEY, STATE OF NEW YORK, STATE OF OREGON, GOVERNOR JOSH SHAPIRO OF PENNSYLVANIA, STATE OF RHODE ISLAND, STATE OF VERMONT, STATE OF WISCONSIN, | NO. |
| | COMPLAINT |

Plaintiffs,

v.

U.S. DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, in his official capacity as Secretary of Transportation; FEDERAL HIGHWAY ADMINISTRATION; AND SEAN MCMASTER, in his official capacity as administrator of the Federal Highway Administration,

Defendants.

COMPLAINT                    1

**INTRODUCTION**

1.      On the first day of his term, President Trump issued the executive order *Unleashing American Energy*, which, in a section titled "Terminating the Green New Deal," directed all federal agencies to "immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 … or the Infrastructure Investment and Jobs Act"—including, specifically, "funds for electric vehicle charging stations made available through the National Electric Vehicle Infrastructure [NEVI] Formula Program and the Charging and Fueling Infrastructure [CFI] Discretionary Grant Program."

2.      The U.S. Department of Transportation (USDOT) and Federal Highway Administration (FHWA), which administer the NEVI and CFI programs, proceeded to implement the President's executive order by, among other actions, categorically and indefinitely suspending new obligations of NEVI and CFI funds.

3.      Earlier this year, this Court found that Defendants' actions to suspend the NEVI Formula Program were likely unlawful and granted the Plaintiff States' motion for a preliminary injunction. Dkt. No. 110, *Washington v. U.S. Dep't of Transportation*, Case No. 2:25-cv-00848-TL (W.D. Wash. June 24, 2025). The present lawsuit—brought by many of the same Plaintiff States, against the same Defendants—now challenges Defendants' actions to indefinitely suspend the CFI Discretionary Grant Program. Those actions have placed $1.8 billion in federal awards to dozens of State and local governments in jeopardy and made the vast majority of these funds unavailable.

4.      This lawsuit also challenges Defendants' actions to indefinitely suspend the Electric Vehicle Charger Reliability and Accessibility Accelerator (Accelerator) Program. The Infrastructure Investment and Jobs Act of 2021, also known as the Bipartisan Infrastructure Law, sets aside 10% of the $5 billion appropriated for the NEVI Formula Program "for grants to States or localities that require additional assistance to strategically deploy electric vehicle charging infrastructure." Pub. L. No. 117-58, 135 Stat. 429, 1425 (IIJA). FHWA awarded

$148.8 million from the NEVI set-aside to States and localities in Accelerator grants to repair or replace non-operational electric vehicle (EV) charging ports and to improve the reliability of existing infrastructure. But around the time that Defendants suspended new CFI obligations, they suspended activity on the Accelerator awards as well.

5.    Defendants have never publicly explained their actions suspending the CFI and Accelerator grant programs (together, the Charging Program Suspensions). Thus, Defendants have offered even less reasoning than they did when suspending the NEVI Formula Program by letter. Instead, responses by FHWA regional offices to CFI and Accelerator awardees' inquiries range from the dilatory ("I am waiting for a respond [*sic*] from FHWA on this"), to the cryptic ("The CFI project is still under [Office of the Secretary of Transportation] review, and it has not been approved to move forward with obligating additional funds."), to outright silence. Some FHWA officers indicated that the CFI and Accelerator grants were under review for consistency with the President's executive orders and USDOT directives to implement those orders.

6.    An unpublished USDOT guidance memorandum issued on or about March 11, 2025 (March Guidance Memo), confirms that Defendants' actions to suspend the CFI and Accelerator programs stem from a unified policy directive. The March Guidance Memo directs a review of all unobligated or partially obligated competitive award selections for disfavored subjects like climate change, EVs, and EV charging infrastructure. It further directs that projects including these "flagged activities" must be reviewed by USDOT leadership for one of three possible actions: (1) continuation without change, (2) revision with a reduced or modified scope, or (3) cancellation.

7.    Since early 2025, all unobligated or partially unobligated CFI and Accelerator awards in Plaintiff States have remained suspended in this limbo, with no new obligations approved—and indeed, no action at all to spend the billions of dollars that Congress directed USDOT to spend on expanding EV charging infrastructure across the nation. As numerous

1    courts across the country have confirmed, such categorical, indefinite, and unreasoned funding

2    freezes are arbitrary and capricious and contrary to law. *See, e.g.*, *Woonasquatucket River*

3    *Watershed Council v. U.S. Dep't of Agric.*, 778 F.Supp.3d 440, 468 (D.R.I. 2025); *Louisiana v.*

4    *Biden*, 622 F. Supp. 3d 267, 291–92 (W.D. La. 2022) (collecting cases). This Court held the

5    suspension of NEVI obligations was likely unlawful for similar reasons. *Washington v.*

6    *USDOT*, Dkt. No. 110 at 39–52 (June 24, 2025).

7        8.      On September 30, 2025, the 2025 fiscal year ended. Many federal agencies

8    rushed to obligate expiring funds in the last week of September. But FHWA took no action to

9    obligate CFI funds from fiscal year (FY) 2022, which, on information and belief, are subject to

10   a general three-year availability period for federal highway appropriations. *See* 23 U.S.C.

11   § 118(b). On information and belief, FHWA refused to obligate available FY2022 CFI funds

12   within this period as part of a deliberate policy to freeze, suspend, and defund the unobligated

13   portions of CFI awards supported by that appropriation.

14       9.      The Executive Branch's unlawful failure to obligate funding—whether or not its

15   underlying appropriation lapses—is known as an "impoundment." Impoundment violates the

16   separation of powers by contravening several constitutional provisions, including the Spending

17   Clause, the Take Care Clause, and the Presentment Clause.

18       10.     In this case, Defendants have impounded IIJA-appropriated funds through the

19   categorical suspensions of new obligations under unobligated or partially obligated CFI and

20   Accelerator awards. The Charging Program Suspensions and potentially other, undisclosed

21   agency actions were undertaken pursuant to the USDOT directives implementing the

22   *Unleashing American Energy* executive order and the March Guidance Memo. The

23   Suspensions reflect a final, program-level policy *not* to approve CFI or Accelerator obligations,

24   categorically and indefinitely, without any notice or explanation to the awardees.

25       11.     Defendants' refusal to obligate CFI funds backed by the FY2022 appropriation,

26   even through the close of FY2025, indicates that Plaintiff States' only recourse to preserve

COMPLAINT                                4                    ATTORNEY GENERAL OF WASHINGTON
                                                                Environmental Protection Division
                                                                  800 Fifth Avenue STE 2000
                                                                     Seattle, WA 98104
                                                                        206-464-7744

their ability to receive the billions of dollars in congressionally mandated funding at issue in this case is to file this lawsuit.

### JURISDICTION AND VENUE

12.     This action arises under the Constitution, the IIJA, the Administrative Procedure Act (APA), 5 U.S.C. §§ 553, 701–706, and other applicable laws of the United States. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 1346(a)(2).

13.     An actual, present, and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

14.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities. The State of Washington is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within the Western District of Washington.

### PARTIES

#### Plaintiffs

15.  Plaintiffs are sovereign states of the United States of America. Plaintiffs bring this action in their sovereign and proprietary capacities. As set forth below, Defendants' actions directly harm Plaintiff States' interests, including but not limited to financial and environmental harms that flow from the Defendants' unlawful actions.

16.  The State of Arizona is represented by and through Attorney General Kris Mayes, who is the chief law enforcement officer of Arizona.

17.  The State of California is represented by and through Attorney General Rob Bonta, California's chief law enforcement officer, and by and through Governor Gavin Newsom, the California Department of Transportation (Caltrans), and the California Energy Commission. Caltrans and the California Energy Commission jointly administer the implementation of EV

charging infrastructure programs funded by NEVI Formula funds, CFI awards, and an Accelerator award to the State.

18.  The State of Colorado is represented by Philip J. Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

19.  The State of Delaware is represented by and through Attorney General Kathleen Jennings, who is the chief law officer of Delaware and is authorized to bring this action on behalf of the State.

20.  The District of Columbia is represented by and through Attorney General Brian L. Schwalb, who is the chief legal officer of the District of Columbia.

21.  The State of Illinois is represented by Attorney General Kwame Raoul, who is the chief law enforcement officer of Illinois.

22.  The State of Maryland is represented by Attorney General Anthony G. Brown, who is the chief law enforcement officer of Maryland.

23.  The Commonwealth of Massachusetts is represented by Attorney General Andrea Campbell, who is the chief law enforcement officer of Massachusetts.

24.  The State of Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

25.  The State of New Jersey is represented by Attorney General Matthew Platkin, who is the chief law enforcement officer of New Jersey.

26.  The State of New York is represented by and through Attorney General Letitia A. James, who acts as the chief legal representative of the State.

27.  The State of Oregon is represented by and through Attorney General Dan Rayfield, who is the chief legal officer of Oregon.

28.  Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme

executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring suit on his own behalf and on behalf of executive agencies under his jurisdiction. 71 P.S. §§ 732-301(6), 732-303, 732-204(c).

29.   The State of Rhode Island is represented by and through Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

30.   The State of Vermont is represented by and through Attorney General Charity R. Clark. Attorney General Clark is authorized to initiate litigation on Vermont's behalf.

31.   The State of Washington is represented by and through Attorney General Nicholas W. Brown, who is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern.

32.   The State of Wisconsin is represented by and through Attorney General Josh Kaul, who is the chief law enforcement officer of Wisconsin.

**Defendants**

33.    Defendant United States Department of Transportation is a cabinet agency within the Executive Branch of the United States government. 49 U.S.C. § 102(a).

34.    Defendant Sean Duffy is the Secretary of the USDOT and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. 49 U.S.C. § 102(b). He is sued in his official capacity.

35.    Defendant Federal Highway Administration is an administration within the United States Department of Transportation. 49 U.S.C. § 104.

36.    Defendant Sean McMaster is the Administrator of the Federal Highway Administration within the United States Department of Transportation. The Administrator is responsible for carrying out the duties and powers vested in the Secretary of Transportation by chapter 4 of title 23 of the United States Code for highway safety programs, research, and development related to highway design, construction and maintenance, traffic control devices,

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

1  identification and surveillance of accident locations, and highway-related aspects of pedestrian

2  safety; and additional duties and powers prescribed by the Secretary. 49 U.S.C. § 104(b)(1). He

3  is sued in his official capacity.

**ALLEGATIONS**

4

**I.    LEGAL BACKGROUND**

5

**A.    The Constitutional Framework for Federal Spending**

6

7        37.    The Constitution provides Congress the exclusive "power of the purse." *City &*

8  *Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) (*City & County of S.F.*).

9  "The power over the purse was one of the most important authorities allocated to Congress in

10  the Constitution's 'necessary partition of power among the several departments.'" *U.S. Dep't*

11  *of Navy v. Fed. Labor Rel. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.)

12  (quoting *The Federalist* No. 51, at 320 (James Madison) (Clinton Rossiter ed. 1961)). Two

13  parts of that power are relevant here: Spending and Appropriations.

14        38.    The Spending Clause provides Congress authority "[t]o lay and collect Taxes,

15  Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and

16  general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. The Appropriations Clause

17  provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of

18  Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. By ensuring money can be

19  expended only by Congressional appropriation, the Appropriations Clause ensures all money

20  expended for the common welfare is subject to the policy judgments of Congress.

21        39.    Congress has authority to make appropriations discretionary or mandatory, and

22  its practices reflect that flexibility. *CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 430–

23  32 (2024). Over the course of history, Congress has structured some appropriations as

24  spending ceilings. *See e.g.*, Act of Feb. 28, 1803, ch. 11, 2 Stat. 206 (authorizing the President

25  to spend "a sum not exceeding fifty thousand dollars" to construct "a number not exceeding

26  fifteen gun boats."). When Congress intends to provide discretionary spending authority, it

COMPLAINT                                   8                  ATTORNEY GENERAL OF WASHINGTON
                                                              Environmental Protection Division
                                                              800 Fifth Avenue STE 2000
                                                              Seattle, WA 98104
                                                              206-464-7744

does so *clearly*. *See, e.g.*, *CFPB*, 601 U.S. at 432–33; *id*. at 442–43 (Kagan, J., concurring). Congress's spending decisions are otherwise mandatory. *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.). When Congress deploys mandatory language in laws that provide for annual appropriations, funding under those laws must be obligated before the end of the period specified in the law. *Train v. City of New York*, 420 U.S. 35, 47 (1975).

40.     The Constitution also vests in Congress all legislative powers and prescribes the specific procedures of bicameralism and presentment by which laws may be enacted. U.S. Const. art. I, § 1; *id.*, art. I, § 7, cls. 2, 3. This process reflects the "finely wrought and exhaustively considered" procedure imposed by our Constitution to enforce the separation of powers. *INS v. Chadha*, 462 U.S. 919, 951 (1983).

41.     Upon presentment to the President of a bill passed by both Houses of Congress, the President may sign the bill into law, veto it in its entirety, or take no action on it for a period of ten days, after which time it becomes law. U.S. Const. art. I, § 7, cl. 2. Past the formal veto process, the President may not modify or ignore the statutory directives of Congress, including those which require spending. *Clinton v. City of New York*, 524 U.S. 417, 446–49 (1998); *Kendall v. U.S. ex rel Stokes*, 37 U.S. 524, 608 (1838); *Train*, 420 U.S. at 44–47.

42.     The Constitution imposes on the President a duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The Take Care Clause requires the Executive to respect Congress's legislative authority. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker."); *see also Train*, 420 U.S. at 44–45 (explaining the Executive may withhold appropriated funds only when authorized by statute). The duty to faithfully execute the laws passed by Congress is the President's "most important constitutional duty." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992). That same duty runs to the subordinate executive agencies. *In re Aiken County*, 725 F.3d at 259.

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

1    43.    The duty imposed by the Take Care Clause does not include a dispensing

2    power—i.e., the power to *not* execute the laws of Congress in certain situations. *Kendall*, 37

3    U.S. at 608. Applied to appropriations, the absence of a "dispensing power" means that "the

4    President must follow statutory mandates so long as there is appropriated money available"

5    and "may not decline to follow a statutory mandate or prohibition simply because of policy

6    objections." *In re Aiken County*, 725 F.3d at 259. These are "bedrock principles." *Id.*

7    **B.    Statutory Control of Spending and Appropriations**

8    44.    Congress authorizes federal spending not through a single piece of legislation

9    but through many. Appropriations statutes are laws that provide authority to the Executive

10   Branch to obligate and expend funds for particular purposes, amounts, and periods. An

11   "obligation" is a "definite commitment that creates a legal liability of the government for the

12   payment of goods and services ordered or received, or a legal duty … that could mature into"

13   such a liability. *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 307–08 (2020)

14   (quoting U.S. Gov't Accountability Off. (GAO), GAO-05-734SP, *A Glossary of Terms Used in*

15   *the Federal Budget Process* at 70 (Sept. 2005)).[1] An "expenditure," also known as a

16   "disbursement," is the actual spending of federal funds. GAO, GAO-05-734SP at 48.

17   45.    Congress may, and often does, place time limits on these appropriations. In such

18   instances, the budget authority created in the statute must be exercised by the Executive

19   Branch within the period set forth in the statute. Specifically, the funds must be obligated

20   during that period.

21   46.    The default rule is that budget authority is limited to a single fiscal year.

22   31 U.S.C. § 1301(c)(2); *see, e.g.*, IIJA § 902, 135 Stat. at 1444 ("No part of any appropriation

23   contained in this division shall remain available beyond the current fiscal year unless expressly

24   so provided herein."). In that circumstance, appropriated funds must be obligated before

25   September 30, which is the final day of the fiscal year. For Federal-aid highway funds

26   _____

[1] Available at https://www.gao.gov/assets/gao-05-734sp.pdf.

allocated to States under Title 23, the general rule is that funds "remain available for obligation in that State for a period of 3 years after the last day of the fiscal year for which the funds are authorized." 23 U.S.C. § 118(b).

47.     To ensure federal spending comports with its judgments, Congress has enacted a framework for federal spending through multiple overarching statutes. The "purpose statute" provides that appropriated funds must be used only for the purposes that Congress has designated. 31 U.S.C. § 1301(a). The Antideficiency Act and the Impoundment Control Act of 1974 are separate controls that provide the *only* mechanisms available to the President to seek to reserve, rescind, or delay funding required to be spent by appropriations statutes.

**The Antideficiency Act**

48.     The Antideficiency Act prohibits executive officers from obligating or spending funds which Congress has not appropriated. 31 U.S.C. § 1341. The act requires the Executive to apportion funds throughout the fiscal year in a manner which ensures agencies do not spend their appropriations too quickly. *Id.* § 1512.

49.     The Antideficiency Act also allows the President to create reserves in limited circumstances. Reserves are portions of an appropriation which are set aside "to provide for contingencies; to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or as specifically provided by law." 31 U.S.C. § 1512(c)(1)(A)–(C). Reserves may not be created for policy reasons or in a manner that "thwart[s] the will of Congress." S. Rep. No. 93-688 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 3504, 3573 (1974). To create a reserve, the Executive must first propose the funds for rescission or deferral in accordance with the Impoundment Control Act. 31 U.S.C. § 1512(c)(2); 2 U.S.C. § 684.

**The Impoundment Control Act**

50.     The Impoundment Control Act of 1974, 2 U.S.C. §§ 681 *et seq.* (ICA), was passed in direct response to policy-based impoundments during the Nixon Administration,

when the President erroneously asserted an "absolutely clear" "constitutional right" to

impoundment, *Clinton*, 524 U.S. at 468 (Scalia, J., concurring in part and dissenting in part).

51.    The ICA "operat[es] on the premise that when Congress appropriates money to

the executive branch, the President is required to obligate the funds." GAO Letter, No. B-

329092, *Impoundment of the Advanced Research Projects Agency-Energy Appropriation*

*Resulting from Legislative Proposals in the President's Budget Request for Fiscal Year 2018*,

at 2 (Dec. 12, 2017).[2] The ICA does not define or change the Constitutional division of powers,

responsibilities and duties of the Executive or Congress, nor was intended to do so. *See* 2

U.S.C. § 681(1).

52.    Instead, the ICA created a procedure—a "special message" to Congress—by

which the President may request that Congress rescind an appropriation or delay spending

federal funds under a set of highly circumscribed conditions. *Id.* §§ 683, 684. Once the

President, or their delegate, transmits the special message requesting the rescission of funds,

Congress must pass a rescission bill revoking the appropriations within 45 days of continuous

session. *Id.* § 683(b). It is this bill which rescinds the funds, rather than the President's request.

If Congress does not act, the relevant budget authority "shall be made available for obligation."

*Id*. The ICA does not authorize rescission by any other mechanism other than an Act of

Congress. *Id.* §§ 681(4), 682(3), 683(b).

53.    The ICA also allows the President to "defer" budget authority, but only when

consistent with legislative policy. 2 U.S.C. § 684(b). A deferral is a delay in the exercise of

budget authority within a fiscal year. "Deferrals shall only be permissible—(1) to provide for

contingencies; (2) to achieve greater savings made possible by or through changes in

requirements or greater efficiency of operations; or (3) as specifically provided by law." 2

U.S.C. § 684(b)(1)–(3); *see also City of New Haven, Conn. v. United States*, 809 F.2d 900, 906

n.18 (D.C. Cir. 1987). Deferrals made for policy reasons are prohibited. 2 U.S.C. § 684(b).

---

[2] Available at https://www.gao.gov/assets/b-329092.pdf.

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

1    Deferrals which extend past the end of the fiscal year are also prohibited, meaning this

2    procedure cannot be used to effectively cancel budget authority. *Id.* § 684(a).

3    **C.    The Infrastructure Investment and Jobs Act, the NEVI Set-Aside Grant Program,**
       **and CFI Discretionary Grant Program**

4

5         54.    On November 15, 2021, President Biden signed into law the Bipartisan

6    Infrastructure Law, enacted as the IIJA. 135 Stat. 429. The IIJA was the result of significant

7    compromise and ultimately passed the Senate by a bipartisan, filibuster-proof majority (69 to

8    30), receiving votes from both the majority and minority leaders. 167 Cong. Rec. S6203 (Aug.

9    10, 2021).

10        55.    The IIJA established both the NEVI Formula Program and the CFI

11   Discretionary Grants Program.

12   **The NEVI Set-Aside (Accelerator) Grant Program**

13        56.    The NEVI Set-Aside Grant Program is created under and funded through the

14   NEVI Formula Program. For the NEVI Formula Program, Congress appropriated $5 billion,

15   divided into five annual appropriations for fiscal years 2022 to 2026, and mandated that those

16   funds "shall be to carry out the [NEVI] Formula Program," and specifically, assist States "to

17   strategically deploy electric vehicle charging infrastructure." 135 Stat. at 1421–22. The IIJA

18   directs that, after setting aside funds for the program's administration and a discretionary grant

19   program, NEVI funds shall be distributed to all 50 States according to the Federal-aid highway

20   formula. *Id.* at 1422, 1425. All NEVI funds—whether formula funds or discretionary grant

21   funds—"remain available until expended." *Id*. at 1421.

22        57.    While *Washington v. USDOT* concerns NEVI formula funds, the grant program

23   funded by the set-aside is at issue here. The IIJA directs 10% of each annual NEVI

24   appropriation to "grants to States or localities that require additional assistance to strategically

25   deploy electric vehicle charging infrastructure" and provides that, "not later than 1 year after

26

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

1  the date of enactment of this Act, the Secretary shall establish a grant program to administer to

2  States or localities the amounts set aside under the preceding proviso." 135 Stat. at 1425.

3        58.     In 2023, FHWA directed the first round of funding from this 10% set-aside to

4  the Electric Vehicle Charger Reliability and Accessibility Accelerator, which focuses on

5  repairing or replacing non-operational EV chargers. Using the 10% set-aside from the FY2022

6  and FY2023 NEVI appropriations, FHWA awarded $148.8 million to 14 States' transportation

7  departments and 10 local entities in January 2024. *See* Ex. 1.

8        59.     Despite these awards nearly two years ago, FHWA has not announced any

9  funding opportunity backed by the 10% set-aside from FY2024–FY2026 NEVI appropriations.

10  **The CFI Discretionary Grant Program**

11        60.     The IIJA also created the CFI Discretionary Grant Program, codified at

12  23 U.S.C. § 151(f), which authorizes USDOT to obligate $2.5 billion to States and local

13  governments for the "acquisition and installation of publicly accessible [EV] charging

14  infrastructure, hydrogen fueling infrastructure, propane fueling infrastructure, or natural gas

15  fueling infrastructure that is directly related to the charging or fueling of a vehicle." 23 U.S.C.

16  § 151(f)(6)(A). The IIJA divides the $2.5 billion authorization into five annual appropriations:

17  $300 million in FY2022, $400 million in FY2023, $500 million in FY2024, $600 million in

18  FY2025, and $700 million in FY2026. IIJA § 11101(b)(1)(C), 135 Stat. at 445.

19        61.     Much like the NEVI program, the CFI program prioritizes installation of

20  charging and fueling infrastructure along federally designated alternative fuel corridors.

21  23 U.S.C. § 151(f)(6)(B); *see* 135 Stat. at 1423–24. However, CFI reserves 50% of

22  appropriated funds for "Community grants" that reduce greenhouse gas emissions and expand

23  access to EV charging and alternative fueling infrastructure in underserved areas. 23 U.S.C.

24  § 151(f)(8)(D), (F).

25        62.     Although the CFI grants are competitive awards, the IIJA provides detailed

26  criteria for the eligibility of awardees, the use of awarded funds, and the selection of awardees.

1   *Id.* § 151(f)(3)–(11). For example, in awarding Community grants, USDOT must give priority

2   to projects that expand EV charging and alternative fueling infrastructure within rural areas,

3   low- and moderate-income neighborhoods, and high-density communities. *Id.* § 151(f)(8)(F).

4   Both the corridor designations and the selection of Community grants serve an overall

5   statutory goal of reducing greenhouse gas emissions. *Id.* § 151(a), (f)(8)(D).

6       63.     The Secretary of Transportation has delegated responsibility for the CFI

7   program to FHWA, and the agency has made three rounds of awards funded by FY2022 to

8   FY2025 funds: $623 million in Round 1A, announced January 11, 2024; $521 million in

9   Round 1B, announced August 27, 2024; and $635 million in Round 2, announced January 10,

10  2025. *See* Exs. 2, 3, 4 (lists of Round 1A, 1B, and 2 awardees).

11      64.     While some CFI Round 1A awards have been fully obligated, numerous CFI

12  awards—including Round 1A and 1B awards—were partially unobligated as of early 2025, as

13  these have proceeded on a project-by-project or phase-by-phase obligation process. Other

14  announced CFI awards, including all of Plaintiff States' Round 2 awards, are not yet subject to

15  executed award agreements.

16      65.     FHWA obligates funds on a "first in, first out" basis: that is, it funds awards

17  starting with the oldest applicable appropriation. This means that Round 1A awards were

18  funded by FY2022 and FY2023 appropriations; Round 1B awards were funded by FY2023 and

19  FY2024 appropriations; and Round 2 awards were funded by FY2024 and FY2025

20  appropriations.

**Table 1: Funding Sources for CFI Awards**

| Round | Announced | Total Awarded | Appropriation |
|-------|-----------|---------------|---------------|
| 1A | January 11, 2024 | $623 million | FY2022, FY2023 |
| 1B | August 27, 2024 | $521 million | FY2023, FY2024 |
| 2 | January 10, 2025 | $635 million | FY2024, FY2025 |

COMPLAINT                             15                  ATTORNEY GENERAL OF WASHINGTON
                                                          Environmental Protection Division
                                                          800 Fifth Avenue STE 2000
                                                          Seattle, WA 98104
                                                          206-464-7744

66.    FHWA has not announced any funding opportunity backed by the $700 million FY2026 CFI appropriation.

67.    Unlike the NEVI appropriations (including the Accelerator funds), which the IIJA specifies "remain available until expended," 135 Stat. at 1421, on information and belief, CFI appropriations are subject to the general three-year availability period for highway appropriations. *See* 23 U.S.C. § 118(b). That statute provides, first, that "authorizations from the Highway Trust Fund … to carry out this title shall be available for obligation on the date of their apportionment or allocation or on October 1 of the fiscal year for which they are authorized, whichever occurs first." *Id.* § 118(a). The statute further provides: "Except as otherwise specifically provided, funds apportioned or allocated pursuant to this title in a State shall remain available for obligation in that State for a period of 3 years after the last day of the fiscal year for which the funds are authorized. Any amounts so apportioned or allocated that remain unobligated at the end of that period shall lapse." *Id.*

68.    Section 118(b)'s application to the CFI awards would indicate that, on September 30, 2025—three years after the last day of fiscal year 2022—authority for any unobligated funds from the FY2022 authorization supporting Round 1A awards may have lapsed. Round 1B awards (and several of Plaintiffs' Round 1A awards) may be similarly at risk of lapse on September 30, 2026.

69.    As the following allegations detail, this lapse was not the product of bureaucratic sluggishness or negligence, but part of a considered and deliberate policy to freeze, suspend, and defund the CFI program without notice to awardees.

## II.    FACTUAL BACKGROUND

### A.    The *Unleashing American Energy* Executive Order, the Suspension of the NEVI Program, and the March 12, 2025 Guidance Memo

70.    Hours after his inauguration, President Trump signed Executive Order 14154, titled *Unleashing American Energy*. In Section 2 of the order, the President declared it "the

COMPLAINT                                          16

policy of the United States" to "eliminate the 'electric vehicle (EV) mandate' and promote true consumer choice" by, inter alia, "considering the elimination of unfair subsidies and other ill-conceived government-imposed market distortions that favor EVs over other technologies and effectively mandate their purchase by individuals, private businesses, and government entities alike by rendering other types of vehicles unaffordable." 90 Fed. Reg. at 8353.

71.     The federal government has never adopted any such "EV mandate." But in the name of eliminating this fictional mandate, "[t]erminating the Green New Deal," and effectuating his own policy priorities, the President ordered all federal agencies to "immediately pause the disbursement of funds appropriated through . . . the [IIJA], including but not limited to funds for electric vehicle charging stations made available through the National Electric Vehicle Infrastructure Formula Program and the Charging and Fueling Infrastructure Discretionary Grant Program." *Unleashing* EO, § 7, 90 Fed. Reg. at 8357.

72.     The President further directed all agencies to "review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds for consistency with the law and the policy outlined in section 2 of this order." *Id.*

73.     In short, the President directed agencies to withhold congressionally appropriated NEVI and CFI funds as a tool to terminate programs the President dislikes.

74.     On January 29, 2025, the USDOT issued a memorandum titled, "Implementation of Executive Orders Addressing Energy, Climate Change, Diversity, and Gender."[3] The January 29 memo interprets the *Unleashing* EO to require USDOT to "identify and eliminate" all "funding agreements" and "programs" adopted by the Biden Administration "which reference or relate in any way to climate change, 'greenhouse gas' emissions, … environmental justice, or the Justice40 initiative."

---

[3] Available at https://www.transportation.gov/sites/dot.gov/files/2025-01/Signed%20Secretarial%20Memo_%20Implementation%20of%20Executive%20Orders%20Addressing%20Energy%20Climate%20Change%20Diversity%20and%20Gender.pdf.

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

75.     Also on January 29, 2025, the USDOT issued an order titled "Ensuring Reliance Upon Sound Economic Analysis in [USDOT] Policies, Programs, and Activities." Order No. DOT 2100.7 (Jan. 29, 2025).[4] DOT Order 2100.7 requires "all DOT grants, loans, contracts, and DOT-supported or -assisted state contracts" to "prioritize projects" that, among other things, "require local compliance or cooperation with Federal immigration enforcement and with other goals and objectives specified by the President of the United States or the Secretary [of Transportation]." *Id.* § 5(f)(v).

76.     On February 6, 2025, FHWA informed states by letter that it was rescinding the current and prior agency guidance on the NEVI Formula Program "to align with current U.S. DOT policy and priorities," and that, as a result, FHWA was immediate suspending its previous approvals of state NEVI plans and prohibiting new obligations under the NEVI Formula Program. *See Washington v. USDOT*, Dkt. No. 1 at ¶¶ 104–109 (May 7, 2025).

77.     On or about March 11, 2025, the USDOT's Office of the Assistant Secretary of Transportation Policy (OST-P) sent a guidance directive to all USDOT agencies, including FHWA, explaining USDOT policy in implementing the *Unleashing* EO and the January 29 memo. *See* Ex. 5.[5] USDOT never published the March Guidance Memo or otherwise formally gave notice to USDOT awardees of this policy.

78.     The March Guidance Memo applies to "[a]ll competitive grant and cooperative agreement award selections" made after January 20, 2021—i.e., under the Biden Administration—"that do NOT have fully obligated grant agreements or cooperative agreements in place." For such award selections, the Memo requires compliance with "current

---

[4] Available at https://www.transportation.gov/sites/dot.gov/files/2025-02/DOT_2100.7-Ensuring_Reliance_Upon_Sound_Economic_Analysis_in_DOT_Policies.pdf.
[5] While USDOT never published or formally disclosed the March Guidance Memo, several transportation agencies, including the American Public Transportation Association and National Association of City Transportation Officials, have posted purported copies of the memorandum online. *See, e.g.*, https://www.apta.com/wp-content/uploads/DOT-OST-MEMO-Competitive-Grant-Guidance-03-11-2025.pdf (last visited December 14, 2025); https://nacto.org/wp-content/uploads/March-11-2025-USDOT-Grants-Directive.pdf (last visited December 14, 2025).

1    administration priorities and Executive Orders (EO) that address energy, climate change, . . .

2    and other priorities," including the *Unleashing* EO.

3         79.    The Memo accordingly directs a review of "all award selections without grant

4    agreements and partially obligated grant agreements"—i.e., an agreement that stages

5    obligations of funds by project or phase. For such partially obligated agreements, the review

6    must take place "before awarding subsequent phases or adding additional funds to an existing

7    grant agreement."

8         80.    The review consists of three steps, each of which and in combination serves to

9    indefinitely postpone, reduce, or cancel awards based on the policy preferences the President

10   expressed in his executive orders.

11        81.    *First*, USDOT secretarial offices and operating administrations (for simplicity,

12   "agencies and offices") must identify award selections that "may have included" certain

13   flagged elements: "equity activities, Diversity, Equity, and Inclusion (DEI) activities, climate

14   change activities, environmental justice (EJ) activities, gender-specific activities, when the

15   primary purpose is bicycle infrastructure … , electric vehicles (EV), and EV charging

16   infrastructure." These elements are to be flagged in the first step even when "[s]tatutory

17   language includes equity requirements, climate considerations, or bicycle infrastructure."

18        82.    *Second*, program teams review flagged award selections to "flag any project

19   scope elements or activities for potential removal, including . . . equity analysis, green

20   infrastructure, bicycle infrastructure, EV and/or EV charging infrastructure" and projects that

21   "purposefully improve the condition for EJ communities or actively reduce [greenhouse gas]

22   emissions." If these project scope elements are "based in statute," the review is not terminated

23   but instead escalated to legal counsel and agency/office leadership. The agency or office

24   leadership then reviews the program teams' findings and recommends to OST-P and the Office

25   of the General Counsel—that is, the top policy and legal leadership of USDOT—"which

26   project selections should: [a] Continue in their current form with no change; [b] Be revised

COMPLAINT                                    19

1     with a reduced or modified scope; or [c] Be canceled entirely."

2         83.     *Third*, the Memo requires award selections flagged for revision "to eliminate

3 flagged activities." The Memo recommends program teams "negotiate with project sponsors to

4 update project scopes to eliminate and, where possible, replace those identified elements" but,

5 if the sponsor does not agree, requires program teams to "proceed with a reduced award that

6 removes the flagged scope and activities."

7         84.     The March Guidance Memo's "Step 3" does not specify what should happen to

8 award selections that, by law, *must* include and indeed consist entirely of the flagged elements.

9         **B.**       **The Charging Program Suspensions**

10        85.     During the Biden Administration, FHWA announced several rounds of award

11 selections to Plaintiffs and others under the CFI and Accelerator programs. These competitive

12 award selections either lack executed grant agreements or are subject to partially obligated

13 grant agreements. Moreover, all CFI and Accelerator award selections concern projects for

14 EVs, EV charging infrastructure, and zero-emission hydrogen fueling that "actively reduce"

15 greenhouse gas emissions and/or "purposefully improve the condition for EJ communities."

16 March Guidance Memo at 2.

17        86.     Per the IIJA's provisions, none of these award selections can be feasibly or

18 lawfully modified to remove those elements.

19        87.     Instead, Defendants have implemented the Charging Program Suspensions: they

20 have indefinitely and categorically suspended all new obligations under the CFI and

21 Accelerator programs, without notice or explanation to awardees, by rejecting or refusing to

22 process obligation requests, refusing to execute award agreements, refusing to issue new

23 funding opportunities, and similar actions to ensure no more CFI and Accelerator funds are

24 obligated.

25

26

**The Arizona CFI Awards**

88.    In January 2025, FHWA awarded the City of Phoenix a $15 million Round 2 CFI Community award.

89.    The purpose of the CFI Round 2 award was to enable the installation of 150 Level 2 and DC Fast Charging stations in strategic locations throughout the City of Phoenix.

90.    The City of Phoenix is Arizona's most populated area and accounts for approximately 47% of EV ownership in the State of Arizona.

91.    Those funds have not been received by the City nor obligated by FHWA. FHWA has not advanced the Round 2 CFI Award to an executed award agreement.

**California's CFI and Accelerator Award**

92.    In August 2024, Defendant FHWA announced the transportation departments of plaintiffs California, Oregon, and Washington would receive a joint $102 million Round 1B CFI award for building out a freight corridor for medium- and heavy-duty electric vehicles. The award's funding for medium- and heavy-duty EV chargers and hydrogen refueling along this tri-state freight corridor is important to these States' climate and transportation policies and attainment and maintenance of federal air quality standards, given the significant greenhouse gas emissions, smog precursors, and other harmful pollutants emitted by freight trucking. *See infra* ¶¶ 221–226. California's share of this CFI award is $60.2 million.

93.    The tri-state CFI award is subject to a partially obligated grant agreement. FHWA executed this agreement with Caltrans on or about January 10, 2025, and approved limited obligations to all three States' agencies for planning and administrative activities on January 16, 2025. The funding left unobligated is planned for pre-construction and construction activities for the medium- and heavy-duty EV charging and hydrogen refueling stations; without it, this essential project cannot move forward. In California, $59.4 million remains unobligated.

94.    Defendant FHWA awarded the California Energy Commission a $55.9 million

21    ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

1  Round 2 CFI award for zero-emission freight transportation along the California-Nevada goods

2  movement corridor and other key freight corridors in California. The Energy Commission's

3  Round 2 award selection has not been advanced to an executed grant agreement, and the full

4  amount is unobligated.

5      95.    Defendant FHWA awarded Caltrans a $63.7 million Accelerator award for

6  repair and replacement of non-operational EV chargers. Caltrans jointly administers the

7  Accelerator award with the California Energy Commission. FHWA and Caltrans executed a

8  grant agreement on or about November 26, 2024, and approved a partial obligation of

9  $660,101 for planning and administrative activities on the same date. None of the outstanding

10  $63.1 million has yet been obligated.

11      96.    In late March 2025, Caltrans attempted to secure obligation of awarded funds

12  for NEVI and CFI projects alike. *See Washington v. USDOT*, Dkt. No. 1 at ¶ 135 (May 7,

13  2025). In an email dated March 28, 2025, an FHWA employee responded to Caltrans's inquiry

14  stating FHWA's headquarters office in Washington, D.C. (FHWA HQ), had not authorized the

15  CFI or Accelerator grant programs to "proceed forward":

16          CFI funds … & NEVI 10% funds … – We have not
           received the authorization from FHWA HQ Program
17          Office to proceed forward with these competitive grant
           programs, although there are unobligated funds
18          available … . Once we receive authorization to move
           forward with these competitive grant programs, we will
19          immediately notify Caltrans.

20

21  The FHWA employee emailed again on March 31, identifying four requests to obligate CFI

22  funds pending in FHWA's grant management portal, stating: "I will ask my team to reject them

23  back to Caltrans. Just wanted to give you a heads-up."

24      97.    The Caltrans employee followed up on April 1: "Is it official that the NEVI and

25  CFI programs are abolished or are they still under review." The FHWA employee responded

26

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

later that day: "I am waiting for a respond on [*sic*] FHWA on this." There was no further follow-up by the FHWA employee.

**Colorado's CFI Awards**

98.    On January 11, 2024, Defendant FHWA announced a CFI Round 1A Corridor award to Colorado State University, a state instrumentality, of $8,977,947.00 for a project entitled "Colorado with Hydrogen Refueling Infrastructure on the I-25 Corridor" (Hy-25). The Hy-25 project is intended to build a network of three public hydrogen fueling stations near CSU campuses located in Fort Collins, Denver, and Pueblo. Because these campuses are situated along the Interstate 25 highway, the State's main north-to-southbound corridor, they will improve accessibility for medium-to-heavy-duty hydrogen powered vehicle fleets, as well as for light-duty EV passenger vehicles across the state.

99.    The Hy-25 project is subject to a partially obligated award agreement. FHWA executed that agreement on August 22, 2024. The agreement calls for two phases: a pre-construction phase (Phase 1), including design and permitting, and a construction phase (Phase 2). Phase 1 funds ($1,135,247.00) were obligated upon execution of the award agreement, while Phase 2 funds are obligated upon FHWA review and approval of applicable prerequisites.

100.    FHWA's Phase 1 funds were obligated out of the FY2022 CFI appropriation; on information and belief, Phase 2 funds are to be obligated out of the FY2023 CFI appropriation.

101.    CSU's efforts to inquire about additional obligations have been unsuccessful.

102.    For example, on September 4, 2025, CSU requested a budget amendment to revise the obligated amount of Phase 1 funds to conform to the final budget it had submitted to FHWA over a year earlier, on August 15, 2024. CSU underscored that the budget amendment would not change the total federal funding share, but, due to a paperwork error, the amounts obligated for Phase 1 had fallen 12% short of the necessary funds to properly complete pre-construction activities. FHWA's Colorado Division Office responded on September 16 that the

1   request to obligate additional funds would require "approval by the Department" and that it

2   "currently cannot proceed until that is obtained."

3       103.    On September 24, 2025, CSU requested a status update on the budget

4   amendment. The FHWA Division Office responded, "The status has not changed since my last

5   email to you on September 16, 2025."

6       104.    On December 10, 2025, CSU again requested a status update on the requested

7   amendment. On the same day, the FHWA Division Office responded, "The CFI project is still

8   under Office of Transportation of Secretary's [*sic*] (OST) review, and it has not been approved

9   to move forward with obligating additional funds."

10      105.    In addition, Boulder County received a Round 1A CFI Community award of

11  $4,900,000.00 to install 94 Level-2 charging stations and 20 direct current fast-charging

12  (DCFC) stations, and to improve equity and accessibility to EV charging stations. Likewise,

13  the City of Pueblo received a Round 2 Community award of $11,520,192.00. Pueblo's project

14  is to fund 260 EV charging ports near low-and moderate-income networks and provide more

15  convenient, affordable, and reliable access to EV charging infrastructure in that part of the

16  state.

17  **The Delaware CFI Award**

18      106.    On January 10, 2025, Defendant FHWA announced a CFI Round 2 Community

19  award to the City of Newark, Delaware in the amount of $590,949.00.

20      107.     The purpose of the CFI Round 2 award was to enable the installation of eleven

21  dual-port EV charging stations and twelve e-bike charging stations, significantly advancing

22  Newark's commitment to sustainability and enhancing access to green transportation options.

23  The infrastructure added through the grant would provide for up to seventeen EV charging

24  stations in total, allowing the City to increase the number of stations at these locations over

25  time as demand rises.

26      108.    Currently, Newark, with a population of 30,506, and the home of the main

Case 2:25-cv-02574    Document 1    Filed 12/16/25    Page 25 of 82

campus of the University of Delaware and its 24,412 undergraduate, graduate, and professional students, has five public EV chargers and zero e-bike chargers. The project funded by CFI would more than triple the City's EV charging capacity, while introducing e-bike charging infrastructure for the first time, ensuring residents and visitors have access to modern, sustainable transportation resources. The new charging stations would be strategically located at various downtown municipal lots, including Curtis Mill Park, Phillips Park, and the George Wilson Center. As a contingency, the Newark Reservoir/Preston's Playground has been identified as a backup location should any of the primary sites prove infeasible.

109.    Those funds have not been received by the City nor obligated by FHWA. FHWA has not advanced the Round 2 award to an executed award agreement.

**The District of Columbia's CFI Award**

110.    On January 10, 2025, the District of Columbia's Department of Energy and Environment (DOEE) received notice from Defendant FHWA that it had been awarded $15 million under CFI Round 2. This Round 2 Community award is critical to the District's efforts to expand electric vehicle infrastructure, reduce transportation-sector emissions, and advance climate and air quality goals.

111.    At this time, FHWA has not released any portion of the $15 million Round 2 CFI award. As a result, DOEE has not received access to the funds. DOEE has made multiple inquiries to FHWA regarding the status of the award, but FHWA has not provided any information beyond stating that the CFI award is under "administrative review."

**Illinois's CFI Awards**

112.    Illinois agencies and instrumentalities were collectively slated to receive approximately $130 million in CFI awards that remain unobligated due to the Charging Program Suspensions.

113.    The Illinois Environmental Protection Agency (IEPA) was selected for a $100 million Round 2 CFI award focused on medium- and heavy-duty charging stations for electric

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

trucks. IEPA received the largest Round 2 CFI award nationwide. Illinois occupies a strategic location in the nation's freight network: From Illinois, a truck can reach 83% of the continental United States within a two-day drive. Illinois is also home to the largest inland port in North America, the CenterPoint Intermodal Center near Joliet, Illinois.

114.    IEPA planned for the $100 million grant to support development of 14 stations with 345 EV charging connectors. This project, if implemented, would significantly expand the range of electric freight transport in Illinois and beyond.

115.    Although IEPA was notified on January 13, 2025, that it had been "selected" for the award, Defendants have taken no further steps to move forward with the project. The FHWA has not obligated any funds, even for initial administrative costs.

116.    Like other States, Illinois has been told that an unspecified review has indefinitely delayed progress toward award ratification and fund obligation. Most recently, on October 2, 2025, an FHWA official based in Chicago emailed IEPA as follows:

> In order to proceed with obligating grants our office must receive approval from the Grant Review Task Force in Washington. To date, the task force has not approved any CFI grants to proceed. So, until we receive notice from HQ, this program is on hold.

117.    Illinois also has received a Round 1B CFI award to the City of Chicago for $15 million and a Round 2 CFI award to the Metropolitan Mayors Caucus for approximately $14.5 million. The Metropolitan Mayors Caucus is a consortium of Illinois subdivisions in the greater Chicago metropolitan area.

118.    In a separate October 2, 2025, email to all Illinois CFI grantees, an FHWA official reiterated that a new "Grant Review Task Force" was still considering whether CFI would be "approved to move forward." The official acknowledged grantees' "frustration with this new process" and stated that "we have little to no information to share on a potential timeline for their approval of this program."

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

1

**Maryland's CFI and Accelerator Awards**

2

119.    Two different Maryland instrumentalities received CFI Awards: the Maryland

3

Clean Energy Center (MCEC) and the Maryland Department of Transportation (MDOT).

4

120.    In January 2024, Defendant FHWA announced that the Maryland Clean Energy

5

Center would receive a $15,000,000 Round 1A CFI Community award for the installation of

6

58 EV charging stations throughout the State of Maryland. The funding also supported

7

$750,000 worth of EV outreach and education and workforce development program activities.

8

That money is to be obligated in two phases: Phase 1 – $1,450,019 (Pre-NEPA[6]); and Phase 2

9

– $13,549,981 (indicated in the award agreement as "Subject to Availability").

10

121.    Phase 1 funds ($1,450,019) were obligated on July 2, 2024. The Phase 2

11

funding has not been obligated to date and therefore projects cannot be implemented, despite

12

having the prerequisite approvals through FHWA.

13

122.    Staff at MCEC are attending FHWA training, working with subrecipients and

14

billing out administrative costs. MCEC met the requirements to proceed with the Round 1A

15

award's implementation on June 5, 2025, yet the award remains under "administrative review."

16

The result has been the loss of permitting approvals, loss of site approvals and increased

17

administrative costs.

18

123.    In August 2024, Defendant FHWA announced that the MCEC would receive a

19

$33,461,414 Round 1B CFI Corridor award for installing 33 Corridor level EV chargers along

20

Alternative Fuel Corridors throughout the State of Maryland. That award also included funding

21

to cover the cost of administering both MCEC's Round 1A and Round 1B CFI funds. MCEC

22

signed the award agreement on December 2, 2024, but FHWA has yet to complete and execute

23

the agreement.

24

124.    MCEC's requests for information, timelines, and updates concerning the award

25

26

---

[6] The National Environmental Policy Act (NEPA) generally requires environmental reviews for Federal-aid highway construction projects before the project can proceed to the construction phase, unless an exemption applies.

agreement amendment and obligation of implementation funds for the CFI Round 1A award and the first signed grant agreement for the CFI Round 1B award have been met with the response that they are under "administrative review." MCEC's most recent communication with FHWA on the week of December 1, 2025 indicated that there was no update to report currently on the status of either award, or any movement forward on the award agreement signatures.

125.    In January 2025, Defendant FHWA announced a joint award of Round 2 CFI funds in the amount of $18,601,736.51 to the MDOT as the lead applicant in a regional project proposal partnering with the New Jersey Department of Environmental Protection and Pennsylvania Department of Transportation. The grant award for the project proposal, called the MD-NJ-PA-WV[7] Charging Ahead Partnership, will fund the deployment of six total electric truck charging depots along the Interstate-81 and Interstate-78 corridors, where significant freight movement occurs throughout participating states. Maryland's share of these funds, for deploying one electric truck charging depot, is $3,413,622.75.

126.    On January 21, 2025, FHWA via the CFIAwardees@dot.gov email address postponed the welcome webinars for Round 2 CFI awardees originally scheduled for January 23, 2025, and February 6, 2025. The announcement stated that "an email from this inbox will be sent when more information is available."

127.    On January 31, 2025, MDOT staff inquired with the FHWA Maryland Division Office's Discretionary Grants Program Manager about the rescheduling of the welcome webinars. On February 10, 2025, that Discretionary Grants Program Manager stated that the FHWA Maryland Division Office was awaiting guidance from FHWA HQ for next steps.

128.    On July 15, 2025, MDOT staff requested an update from the

---

[7] The West Virginia Department of Transportation (DOT) joined the proposal with the intention to participate in the planning component of the project only, if awarded. FHWA did not award the planning component, resulting in West Virginia DOT withdrawing from the project.

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

1  CFIAwardees@dot.gov email address and received an automated email confirming receipt of

2  the message. To this day, MDOT staff have not received further correspondence from this

3  account.

4       129.    On August 1, 2025, FHWA Maryland Division Office staff told MDOT staff

5  that the CFI award "remains under administrative review." According to the Division Office,

6  USDOT "is actively working to review all grant awards for consistency with [DOT] Order

7  2100.7 and all Executive orders and directives issued by the Trump-Vance Administration, as

8  permitted by law. When the review is complete, FHWA will execute grant agreements with

9  award recipients after all requirements under Title 23, United States Code, have been met, and

10  the project is ready for obligation."

11       130.    In January 2024, Defendant FHWA awarded MDOT $4,360,175.68 in

12  Accelerator funds for the repair and replacement of an estimated 44 non-operational EV

13  charging ports.

14       131.    Following the award announcement, MDOT began engaging with FHWA to

15  negotiate funding agreement. MDOT and FHWA held multiple meetings and exchanged

16  comments throughout July 2024. On August 14, 2024, FHWA provided a copy of the

17  Allocation Memo for the project that made the funds available for obligation. FHWA also

18  communicated on August 14, 2024 that the grant agreement would not be signed but the FMIS

19  agreement[8] would be the agreement.

20       132.    MDOT subsequently began the process to amend the various Metropolitan

21  Planning Organization Transportation Improvement Programs (TIP) and the Statewide

22  Transportation Improvement Program (STIP). On February 27, 2025, FHWA denied approval

23  of a STIP amendment for the Accelerator award due to the NEVI state plan approval

---

[8] The Financial Management Information System (FMIS) serves as USDOT's grant management portal. *See Washington v. USDOT*, Dkt. No. 39-1 at ¶ 12 (May 28, 2025) (Declaration of Emily Biondi, USDOT's Associate Administrator for Planning, Environment, and Realty, describing "electronic project agreements" created in FMIS to obligate NEVI funds).

1  suspension by FHWA. MDOT continued the various TIP amendments and included the

2  Accelerator funding in all TIPs and the FY 2025–2028 STIP approved by FHWA in June 2025.

3      133.    After approval of the STIP and the issuance preliminary injunction in

4  *Washington v. USDOT,* the Maryland State Highway Administration began the process to seek

5  authorization for the Accelerator grant funds that were previously made available for

6  obligation. On August 14, 2025, FHWA communicated that the grant program was still under

7  administrative review and the funds could not be authorized. Therefore, SHA did not submit

8  any obligation request in FMIS for FHWA's approval. FHWA also communicated that, despite

9  FHWA's previous communication was that the FMIS agreement would be the agreement, a

10  formal grant agreement would now be required for the Accelerator funds.

11      134.    As of December 4, 2025, MDOT has not been able to execute any type of

12  funding agreement with FHWA to access Accelerator funds for obligation.

13      135.    On September 25, 2025, MDOT staff met with the FHWA Maryland Division

14  Office's Discretionary Grants Program Manager to discuss Maryland's CFI and Accelerator

15  grant awards. FHWA confirmed that both programs were still under administrative review at

16  the time.

17      136.    Beginning in October 2024, the Maryland State Highway Administration's

18  Discretionary Grants Program Manager has convened monthly meetings with FHWA

19  Discretionary Grants team to discuss project updates. Maryland's transportation agency staff

20  have attended most of these monthly meetings and provided updates that the CFI and

21  Accelerator awards are still paused. Each time, the FHWA Discretionary Grants team confirms

22  the program remains under administrative review.

23  **Massachusetts's CFI Award**

24      137.    On January 10, 2025, Defendant FHWA announced an award to the

25  Massachusetts Department of Transportation (MassDOT) of a $14.4 million Round 2 CFI

26  grant for building new EV charging infrastructure across Massachusetts.

138.    The awarded CFI grant would enable Massachusetts to deploy EV charging infrastructure at select state-owned park-and-ride lots and transit station parking lots. If executed, the funds would enable the implementation of approximately 458 Level 2 charging ports (for fast electric charging) and 14 Level 3 charging points (for even faster charging, including for heavy-duty electric vehicles) at approximately 30 locations across the Commonwealth. These locations would provide charging for commuters during the day and be accessible for neighborhood use during off-hours.

139.    In the past, following an FHWA announcement of similar awards to MassDOT, points of contact at FHWA and MassDOT have negotiated over the course of one to two months to finalize an award agreement and obligate the funds.

140.    Initially, the finalization of MassDOT's CFI award seemed likely to proceed similarly. On January 13, 2025, in FHWA formal notification to MassDOT that its application had been selected. In that notification, FHWA stated that, "[i]n the near future, FHWA will provide a CFI Grant Agreement Template" for MassDOT "to complete in preparation for the award," and that FHWA would coordinate with MassDOT to complete the template.

141.    FHWA never provided that template agreement, however. And in the eleven months since FHWA announced the CFI award to MassDOT, communications from Defendant FHWA to MassDOT suggest not only that MassDOT's award has been held up, but that the entire CFI program is not moving forward.

142.    On August 18, 2025, MassDOT's point of contact at Defendant FHWA explained, "we have not received approval from OST [Office of the Secretary of Transportation] to move forward with CFI grant agreements yet. They are still evaluating that program."

143.    Most recently, on November 21, 2025, when a MassDOT representative inquired about the Commonwealth's grant, the FHWA representative responded that "all CFI grants are still under review by OST."

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

1    144.    As a result, none of the $14.4 million of MassDOT's CFI award has been

2    obligated to date.

3    **Michigan's CFI and Accelerator Awards**

4    145.    Defendant FHWA awarded the Michigan Department of Transportation

5    (Michigan DOT) $1,849,200 under the Accelerator grant program, with which it intends to

6    upgrade or repair up to 105 EV charging locations.

7    146.    FHWA, however, has obligated only a small portion ($120,600) to Michigan

8    DOT for initial preliminary-engineering costs, which occurred on December 20, 2024. FHWA

9    declined to obligate the remainder in FY2025, citing the need for further review. Michigan

10    DOT is seeking obligation of the remaining $1,728,600 in FY2026, but FHWA has stated that

11    Michigan DOT cannot formally request obligation until FHWA approves a change in fiscal-

12    year obligation to Michigan DOT's Statewide Transportation Improvement Plan (STIP), which

13    approval remains pending.

14    147.    Michigan DOT's current grant agreement calls for a substantial completion date

15    in December 2026. Based on Defendants' delays in obligating funds, Michigan DOT's

16    procurement and construction timelines will likely be delayed. Additionally, Michigan DOT

17    has issued a request for proposals, which currently are due December 19, 2025. Michigan DOT

18    cannot award contracts in response to those proposals while Defendants appear unwilling to

19    obligate the Accelerator grant funds.

20    148.    Three of Michigan's major urban centers—Detroit, Ann Arbor, Lansing, and

21    Grand Rapids—were awarded nearly $50 million under the CFI grant program (Rounds 1A,

22    1B, and 2). On information and belief, Defendants have obligated CFI funds for only initial

23    planning activities; USDOT has informed these grantees that no funding is being approved for

24    actual implementation at this time.

25    149.    Accordingly, these grantees are being forced to decide whether to spend a

26    combination of local and federal funds (about $1 million and $4 million, respectively, in the

City of Lansing's case) for study, design, and workforce development—without any certainty
whether they will be able to implement those planning efforts.

**New Jersey's CFI and Accelerator Awards**

150.    FHWA awarded the New Jersey Department of Environmental Protection
(NJDEP) $10 million in Round 1A CFI funding in November 2024. NJDEP intended to use
this funding to make subawards for the construction of charging infrastructure near multi-unit
dwellings and transit stops statewide. The award supports New Jersey's long-term climate and
transportation goals. Given the criteria pollutants emitted by internal combustion vehicles,
especially ozone (smog) precursors, the award also supports New Jersey's attainment of
federal air quality standards.

151.    This CFI award is subject to a partially obligated grant agreement. FWHA
obligated an initial $120,000 for NEPA review, with a further $9.8 million to be obligated if
NEPA review is completed by August 1, 2026. NJDEP has not drawn down the $120,000
because it is no longer certain that the remaining funds will be obligated when due.

152.    NJDEP staff reached out to FHWA headquarters regarding the future of the
award but have received no response. NJDEP staff met with FHWA NJ Division Office staff
on August 14, 2025. The FHWA NJ Division Office relayed that they had heard nothing from
FHWA headquarters, and that there is no assurance that the $9.8 million in awarded but
unobligated funding will be available once NEPA review is complete.

153.    Separately, in January 2025, Defendant FHWA awarded NJDEP, the Maryland
Department of Transportation, the Pennsylvania Department of Transportation, and the West
Virginia Department of Transportation $18.6 million to in Round 2 CFI funding. This funding
would support construction of freight truck charging infrastructure along the Interstate-81 and
Interstate-78 corridors across the four states. *See supra* ¶ 125.

154.    In August 2025, FHWA told NJDEP that there would be a kick-off meeting for
this project between NJDEP and FHWA. This meeting has, to date, still not been scheduled.

155.    Defendant FHWA also awarded the New Jersey Department of Transportation (NJDOT) a $5,973,066.88 Accelerator award. On December 18, 2024, FHWA advised that the allocation memo dated December 17, 2024, authorized funds to be posted in FMIS (the FHWA portal used to submit obligation requests) and further noted that the funds were available for obligation now and remain available until expended. The FMIS authorization along with the allocation memo served as the grant agreement.

156.    When NJDOT followed up with FHWA NJ Division Office on January 22, 2025, regarding the funding authorization, a FHWA employee advised that the NJ Division Office was awaiting further direction from USDOT headquarters. NJDOT has not yet received these funds, and the project cannot proceed without them.

**New York's CFI Awards**

157.    FHWA awarded the New York State Energy Research and Development Authority (NYSERDA) a Round 1A CFI grant for its New York State Community Level 2 and DCFC Charging Proposal with $14,786,777 of federal funding and $4,251,993 in cost share, for a total overall award amount of $19,038,770.

158.    NYSERDA executed Assistance Agreement No. 693JJ32440378 (the NYSERDA Agreement) on August 15, 2024, and FHWA on August 20, 2024.

159.    Under the New York State Community Level 2 and DCFC Charging Proposal, NYSERDA committed to install Level 2 charging stations at hundreds of public locations, including state parks, municipal parking lots, and tourist destinations (approximately $7 million of federal funding) and to install DCFC stations at up to five sites (approximately $5 million of federal funding). NYSERDA identified a subset of Level 2 sites in the application and intended to issue solicitations to select the remaining sites and developers. These elements of the program would collectively install approximately 1,000 charging stations across the state.

160.    NYSERDA also included a workforce development element in its proposal.

The lack of enough qualified technicians to meet the growing demand for EV charging installations constrains the ability to expand EV charging infrastructure, so NYSERDA allocated $300,000 from the project budget towards workforce development in partnership with educational institutions in the state to expand the availability of EV charging station training programs.

161.    According to the NYSERDA Agreement, FHWA obligated $2,753,363 for Phase 1 immediately upon the award agreement's execution. This money was authorized for use on administrative tasks, solicitation development, project management, and workforce development, but not for constructing any EV charging stations. Phase 2 funding, totaling $12,033,414 (federal), is to be obligated upon FHWA's confirmation that all the applicable federal and local requirements, including NEPA approvals, have been met. On information and belief, Phase 1 funds were drawn from the FY2022 CFI appropriation and Phase 2 funds are to be drawn from the FY2023 CFI appropriation.

162.    NYSERDA issued a solicitation (RFP 5781) on May 31, 2024, to select an implementation contractor that could assist NYSERDA in managing the administrative tasks associated with this award. NYSERDA made an award under RFP 5781 and entered into an agreement on December 5, 2024.

163.    NYSERDA also has issued a solicitation for partners in workforce development. NYSERDA has not yet issued additional solicitations for EV charging station owners or site hosts as a result of the uncertainty with the federal funding.

164.    To date, NYSERDA has worked to secure all applicable approvals for 20 sites included in the initial proposal. These 20 sites would host a total of 120 Level 2 charging stations. NYSERDA has worked with the prospective EV charging station owners to compile all required NEPA forms and other relevant documentation that would allow NYSERDA to access approximately $1,280,000 of Phase 2 funding associated with these 20 sites. All costs accrued and billed to FHWA for reimbursement to date have been of this administrative variety

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

1  and allocated under Phase 1.

2      165.    NYSERDA submitted NEPA and other related paperwork to FHWA for review

3  for the first 20 sites over the course of four months, between April 2, 2025 and August 15,

4  2025. After FHWA conducted an initial review and determined that NYSERDA had submitted

5  all required paperwork, NYSERDA submitted a formal request for NEPA approval on

6  August 26, 2025.

7      166.    On September 26, 2025, FHWA notified NYSERDA that its submission had

8  been approved for the first 20 sites and that all needed NEPA and related determinations had

9  been made by the federal agency for those 20 sites.

10      167.    Notwithstanding that NYSERDA had satisfactorily met all the applicable

11  federal and local requirements, including NEPA requirements, and received confirmation from

12  FHWA that it has met the Phase 2 condition that should have provided NYSERDA with access

13  to $1,280,000 in construction funding associated with these 20 sites and to prepare submissions

14  for the remaining $10,753,414 in awarded funding, FHWA has taken no steps to make such

15  funding available.

16      168.    On September 30, 2025, in response to a question on how to go forward with

17  obligating construction funding, FHWA staff emailed NYSERDA that "We do not have any

18  approvals for new obligations under CFI or EVC-RAA" and that "[t]he program is still under

19  administrative review."

20      169.    On October 21, 2025, NYSERDA and the FHWA District Office staff

21  submitted a Grant Agreement Amendment request to Mary Murray at FHWA to request the

22  second obligation of the $1,280,000 for construction of the first 20 sites.

23      170.    NYSERDA has heard nothing further from FHWA since this obligation request

24  on October 21, creating uncertainty in the funding availability and limiting NYSERDA's

25  ability to move forward with the program contemplated under the award.

26      171.    In August 2024, the State University of New York (SUNY), a state

1    instrumentality, applied for a $15 million CFI Round 2 Community grant, to be combined with

2    a 20% non-federal match, to install approximately 350 dual-port EV charging stations across

3    its 64-campus system in support of New York's transportation, climate, and air-quality

4    policies.

5         172.    FHWA announced SUNY as a Round 2 CFI awardee on or about January 6,

6    2025, and identified SUNY's $15 million grant on FHWA's CFI Round 2 awards webpage.

7    FHWA contemporaneously notified members of New York's congressional delegation of the

8    award and directed SUNY to forthcoming "welcome webinars" and a standard CFI Grant

9    Agreement Template that SUNY would be expected to complete in preparation for execution

10   of the grant agreement.

11        173.    SUNY promptly began planning in reliance on FHWA's award decision and

12   directions. On January 8, 2025, SUNY notified its campuses of the CFI award and initiated

13   internal work to identify specific charger locations. On January 14, 2025, SUNY confirmed the

14   grant award and designated its internal point of contact, after which FHWA's designated

15   official confirmed he would serve as SUNY's point of contact and "talk through details of

16   getting the grant agreement executed" following the welcome webinars.

17        174.    FHWA then abruptly postponed the scheduled webinars for all CFI awardees.

18   Despite repeated inquiries from SUNY between March and November 2025, FHWA stated

19   only that it is "awaiting guidance" and that it is "not acting on any grant agreements or to

20   develop new agreements" as part of an internal "review" of announced CFI awards, without

21   offering SUNY any process, criteria, or timetable for obligating the awarded funds.

22   **Oregon's CFI Award**

23        175.    As discussed *supra* ¶ 92, in August 2024, Defendant FHWA announced the

24   transportation departments of plaintiffs California, Oregon, and Washington would receive a

25   joint $102 million Round 1B CFI award for building out a freight corridor for medium- and

26   heavy-duty electric vehicles. Oregon's share of the tri-state Round 1B award is

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

1    $21,092,143.00.

2        176.    On January 16, 2025, the FHWA approved a Project Agreement for the Oregon

3    Department of Transportation (ODOT) to use up to $3,163,821 of the $21.1 million CFI award

4    for Interstate-5 Truck Charging and Fueling Stations.

5        177.    Of Oregon's $21.1 million portion of the tri-state CFI award, the FHWA

6    Oregon Division Office confirmed in the Project Agreement that Oregon had met all applicable

7    Federal and local requirements for obligating the remaining $17,928,322. Oregon has not yet

8    submitted an obligation request for the remaining $17.9 million.

9    **Pennsylvania's CFI and Accelerator Awards**

10       178.    In August 2024, Defendant FHWA announced three Round 1B CFI awards

11   within Pennsylvania. The City of Philadelphia received two awards, totaling about $9 million.

12   The City of Pittsburgh received the third award, which was for $2.3 million.

13       179.    In January 2025, FHWA announced three Round 2 CFI Community awards

14   within Pennsylvania, with a fourth award to the Pennsylvania Department of Transportation

15   (PennDOT) and neighboring states.

16       180.    As detailed *supra* ¶ 124, PennDOT, collaborating with the Departments of

17   Transportation for Maryland, New Jew Jersey, and West Virginia, received a $18.6 million

18   Round 2 CFI Corridor award. That award was meant to fund construction of six medium- and

19   heavy-duty charging locations along Interstate-78 and Interstate-81. Three of those six stations

20   would have been built in Pennsylvania.

21       181.    None of the Round 2 awards has advanced to an executed grant agreement, and

22   the full amounts are unobligated.

23       182.    PennDOT also applied for, and was awarded, a $5 million Accelerator award to

24   repair EV charging locations. From that, PennDOT has made three awards, totaling

25   $1.2 million, but has only been able to award this money at locations pre-selected by FHWA,

26   leaving a balance of $3.8 million awarded to PennDOT but yet unobligated.

COMPLAINT                                    38

183.    PennDOT reached out to FHWA on February 10, 2025, to expand the scope of the Accelerator award under the process that had been established by FHWA to award money at locations other than those pre-selected by FHWA. However, PennDOT has not received a response to date, and FHWA has since rescinded that process.

184.    PennDOT is waiting for additional CFI and Accelerator Notices of Funding Opportunities through which it could pursue additional EV funds. For example, if a new CFI funding opportunity is issued, PennDOT intends to resubmit a CFI application that had been submitted in Round 2 but not selected. That unsuccessful proposal sought to build a network of EV charging stations in towns along Route 6, which crosses the Commonwealth north of and parallel to Interstate-80.

**Rhode Island's CFI Award**

185.    Rhode Island, through the Rhode Island Department of Transportation (RIDOT), was awarded $15,000,000 through a Round 1B CFI award for the state's "Charging Ahead – Rhode Island Working Together for Electrification" program (Charging Ahead) to be led by RIDOT in partnership with the Rhode Island Office of Energy Resources.

186.    Through extensive engagement with local governments, nonprofits, and other property owners, Rhode Island developed a prioritized list of 85 publicly accessible charging sites across 10 municipalities, with 72 municipally owned properties included. More than half of the proposed chargers—51%—are located in Disadvantaged Communities to maximize access and address existing gaps in charging availability.

187.    Charging Ahead was meant to provide for installation of more than 200 EV chargers at community-based locations such as municipal offices, schools, parks, redevelopment areas, and public parking lots. Eleven additional sites are State-owned. Sites were selected to fill charging gaps, support local mobility patterns, and prioritize communities with limited access to EV charging infrastructure. Charging Ahead also included education and workforce development aspects.

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

188.    In July 2025, Rhode Island, unable to obligate CFI funds, asked its FHWA Division Office whether these funds could in fact be obligated, but was notified that "[o]nce there is an approved Grant Agreement, RIDOT can obligate those funds."

189.    Despite efforts to finalize an award agreement for Rhode Island's CFI award, the Defendants have never executed the same.

**The Vermont CFI Award**

190.    On August 29, 2024, FHWA announced that Vermont's City of Burlington, through its Electric Department (BED), would be awarded $4.89 million in Round 1B CFI funding to build out its EV charging capacity. Combined with local matching funds, the CFI grant was designed to support the deployment of 153 Level 2 and 47 Level 3 EV charging ports in approximately 85 publicly accessible sites throughout Burlington. The project would expand by six times the city's existing public charging network.

191.    On September 11, 2024, FHWA initiated Round 1B award negotiations with awardees, including the City of Burlington. The City subsequently obtained approval to include the CFI project in Vermont's State Transportation Improvement Plan (STIP), and the Burlington City Council authorized acceptance of the award.

192.    On December 31, 2024, the FHWA Vermont District Office submitted the award agreement to FHWA. On January 10, 2025, Burlington confirmed with FHWA that the award agreement was ready for execution. And on January 22, 2025, Burlington informed FHWA that it had received NEPA clearance for the potential project sites, which Burlington understood to mean that funds could be obligated as soon as the grant agreement was executed by FHWA.

193.    On January 22, 2025 and February 13, 2025, BED emailed FHWA's headquarters in Washington, DC to inquire as to the status of the grant agreement. FHWA HQ did not reply until February 28, 2025, when one FHWA official noted that "OMB Memo M-25-13 directs agencies to, 'temporarily pause all activities related to obligation or disbursement

of all Federal financial assistance, and other relevant agency activities that may be implicated by the [President's] executive orders.' CFI grant and all discretionary grant operations are currently on pause. I have not received any new guidance." *See also infra* ¶¶ 213–214 (discussing OMB Memo M-25-13).

194.    Burlington responded on March 6, 2025, seeking clarification of FHWA's response since the OMB memo referenced in the February 28 communication had been rescinded. On March 11, 2025, FHWA responded, "[t]he cancellation of the [OMB] memo does not hold precedence over the President's Executive Order Unleashing American Energy . . . ." After quoting that executive order, FHWA told Burlington that "FHWA leadership is working with the new Administration for further guidance on how to proceed. Until we receive further guidance from the White House our operating status all discretionary grant actions is on pause."

195.    Since March 6, Burlington reached out to FHWA eight more times (most recently, on December 5, 2025) to inquire about the status of its grant award agreement, including a request on September 30, 2025, that FHWA execute the city's grant agreement and obligate 100% of the funding immediately. FHWA has not, however, executed the agreement or provided any further explanation as to why the agreement had not been executed.

**Washington's CFI Awards**

196.    Plaintiff Washington was a co-recipient, along with Plaintiffs California and Oregon, of the joint $102 million Round 1B CFI award described *supra* ¶ 92. Washington will use its funds to build two medium- and heavy-duty truck fast-charging stations and one hydrogen fueling station along the Interstate-5 corridor.

197.    Washington's share of this joint CFI award is $21 million. $18 million of Washington's funding remains unobligated.

198.    On August 29, 2024, Defendant FHWA informed Washington's University of Washington Bothell campus (a state agency) that it would receive a Round 1B CFI award of

1    $1.1 million for the purpose of installing a DCFC station for Electric Vehicles.

2        199.    The proposed station funded by the CFI award was to be located on the

3    University of Washington Bothell campus in a disadvantaged community and would offer the

4    only Americans with Disabilities Act-accessible fast charger in the surrounding area.

5        200.    Notwithstanding FHWA's notification to the University of Washington Bothell

6    that it had been selected for a Round 1B CFI award, FHWA never finalized its award

7    agreement with the University of Washington Bothell. To date, none of University of

8    Washington Bothell's $1.1 million in CFI funds have been obligated.

9    **The Wisconsin CFI Awards**

10        201.    In August 2024, FHWA announced Round 1B CFI awards to the State of

11    Wisconsin's two most populated areas, the City of Milwaukee and Dane County, in the

12    amounts of $14.9 million and $13.1 million, respectively. These localities account for

13    approximately 40% of EV ownership in the state of Wisconsin. Both localities received and

14    executed a Community award to establish EV charging and alternative fueling stations along

15    public roadways, at schools, in parks, and in accessible parking zones.

16        202.    Milwaukee was awarded $1,120,640 for Phase 1 Pre-Construction; the balance

17    of $13,844,893 for Phase 2 Construction will be obligated after the NEPA review is complete.

18    Dane County was awarded $1,297,759.45 for Phase 1 Pre-Construction; the balance of

19    $11,900,367.32 for Phase 2 Construction will be obligated when the NEPA review is complete.

20        203.    Stakeholders in both localities, including public and private entities and

21    nonprofits have contributed and invested significant time and resources to Phase 1 of the CFI

22    projects. To date, Milwaukee has identified 53 project sites, and has nearly completed the

23    NEPA requirements on 13 of those sites. Dane County has identified more than 50 potential

24    EV charging host sites and completed the NEPA requirements on 31 of those sites.

25        204.    On September 29, 2025, Dane County wrote FHWA to communicate its

26    progress under Phase I and detail the harms both Dane County and its stakeholders will

1  experience if Dane County has does not receive Phase 2 of the award. FWHA has not

2  responded.

3      205.    No new obligations under CFI or Accelerator programs in the Plaintiff States

4  have been approved since March 2025. Indeed, according to FHWA's Illinois Division Office,

5  FHWA HQ has "not approved *any* CFI grants to proceed." *Supra* ¶ 116 (emphasis added);

6  accord *supra* ¶ 143 ("all CFI grants are still under review by OST").

7      206.    Toward the end of fiscal year 2025, federal agencies undertook a flurry of

8  activity to obligate appropriations at risk of lapse across numerous programs—but not CFI.

9      207.    Leading up to September 30, 2025, experts had estimated that federal agencies'

10  obligations were lagging by approximately 20% compared to previous years. Entering the final

11  two months of the fiscal year, this 20% represented $26 billion in funds supporting higher

12  education, substance abuse prevention and treatment, mental health, the Centers for Disease

13  Control, and others.

14      208.    Across programs, the federal government undertook a concerted effort to

15  obligate these funds before the fiscal year "cliff," despite the lag. *See e.g.*, Dept. of Health and

16  Human Services, FY25 SF-133 for TAFS 75-1364 /25 (obligated $3.5 billion in last two

17  months of FY2025).[9] However, the CFI program, targeted by name in the *Unleashing* EO, did

18  not receive similar treatment despite the expiration of the statutory three-year availability

19  period as to the FY22 appropriation.

20      209.    Defendants' failure to act on CFI and Accelerator awards reflects not merely

21  ordinary bureaucratic delay or even neglect. Rather, it evidences an agency-level policy to

22  deliberately not spend CFI and Accelerator funds.

23      **C.    The Trump Administration's Prior Efforts to Illegally Impound Funds**

24      210.    President Trump and officials in his Administration have explicitly stated their

25  _____
[9] Available at https://portal.max.gov/portal/document/SF133/Budget/FY%202025%20-
26  %20SF%20133%20Reports%20on%20Budget%20Execution%20and%20Budgetary%20Resources.html (last
visited December 14, 2025).

1  intent to impound funds to effectuate policy goals in his second term—further confirming that

2  the Charging Program Suspensions reflects just such an impoundment. For example, in

3  November of 2024, Russel Vought, now the Director of the White House Office of

4  Management & Budget (OMB), stated that President Trump would "bring[] back the notion of

5  impoundment … the ability to not spend a congressional appropriation."[10] Mr. Vought stated

6  he "expect[s]" the Administration to challenge the ICA in court to "restor[e]" the principle that

7  "presidents never had to live under the constraint of having to spend every dollar."[11]

8        211.    The Trump Administration quickly put its position into practice to disrupt the

9  flow of funds, and in particular, funds that Congress directed to environmental and climate

10  policies the President disfavored. *Unleashing* EO §§ 2, 7, 90 Fed. Reg. at 8353, 8357.

11        212.    On January 21, 2025, Acting OMB Director Matthew Vaeth issued a

12  memorandum to the heads of all federal agencies stating that the *Unleashing* EO required them

13  to halt disbursement of "appropriations for objectives that contravene the policies established

14  in section 2" of that order. OMB Memorandum No. M-25-11, *Guidance Regarding Section 7*

15  *of the Executive Order* Unleashing American Energy (2025).[12]

16        213.    Days later, OMB issued a memorandum pausing "all activities related to

17  obligation or disbursement for Federal financial assistance" so that Administration officials

18  could audit every program across the federal government for disfavored policies. OMB

19  Memorandum No. M-25-13, *Memorandum for Heads of Executive Departments and Agencies*

20  (Jan. 27, 2025).[13]

21        214.    A coalition that included Plaintiff States challenged that action in federal court.

22

23  [10] Tucker Calson (@TuckerCarlson), X (Nov. 18, 2024, 5:36 PM),
    https://x.com/TuckerCarlson/status/1858640384643002751.
24  [11] American Optimist, *Interview with Russ Vought*, ep. 120 (July 22, 2025),
    https://www.americanoptimist.com/#Season-5-Header.
25  [12] Available at https://www.whitehouse.gov/briefings-statements/2025/01/omb-memo-m-25-11/.
    [13] Available at https://www.whitehouse.gov/wp-content/uploads/2025/03/M-25-13-Temporary-Pause-to-Review-
26  Agency-Grant-Loan-and-Other-Financial-Assistance-Programs.pdf.

COMPLAINT                                          44

The district court granted a preliminary injunction against that action. *New York v. Trump*, 769 F. Supp. 3d 119, 146 (D.R.I. Mar. 6, 2025), *appeal pending*; *see also* 133 F.4th 51 (1st Cir. 2025) (denying Administration's request for a stay of District of Rhode Island's injunction pending appeal). The March 6, 2025 preliminary injunction issued by the *New York v. Trump* district court prohibited the federal agency defendants "from pausing, freezing, blocking, … or otherwise impeding the disbursement of appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations based on the OMB Directive, . . . or any other materially similar order, memorandum, directive, policy, or practice under which the federal government imposes or applies a categorical pause or freeze of funding appropriated by Congress." *Id.* at 146–47.

215.    One enforcement dispute in that case is worthy of particular note, as it resembles the mechanism of the March Guidance Memo. In early February 2025, the Federal Emergency Management Agency imposed a "manual review" process that effectively stopped all currently obligated funds to States by subjecting each disbursement to a high-level review requiring approval by political appointees. *New York v. Trump*, Case No. 1:25-cv-00039-JJM-PAS, Dkt. No. 175, at 7–8 (D.R.I. Apr. 4, 2025). The *New York v. Trump* district court found that this manual review by political leadership effectuated a categorical funding freeze that violated the March 6 injunction. *Id.* at 13–14.

216.    The GAO also has noted several unlawful impoundments by this Administration. Most relevantly, the GAO found that Defendants' suspension of the NEVI Formula Program and their withholding of funds from expenditure pursuant to the February 6, 2025 FHWA letter was an unlawful deferral under the ICA, "and not a programmatic delay." GAO B-337137, *U.S. Department of Transportation, Federal Highway Administration— Application of the Impoundment Control Act to Memorandum Suspending Approval of State Electric Vehicle Infrastructure Deployment Plans* at 18 (May 22, 2025).

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

III.    **THE PLAINTIFF STATES ARE HARMED BY THE CHARGING PROGRAM SUSPENSIONS**

**Arizona**

217.    In March 2024, the Arizona Governor's Office of Resiliency prepared the Arizona Priority Climate Action Plan or "Clean Arizona Plan," which sought to identify measures that, if implemented, could reduce greenhouse gas (GHG) emissions in Arizona.[14] One such measure recommended increasing public access to electric vehicle charging.

218.    The Clean Arizona Plan estimates that increased access to public electric vehicle charging would result in a cumulative reduction of 53,436 metric tons of carbon dioxide ($CO_2$) by 2035, and identifies the CFI Round 2 funding as one means of achieving those emissions reductions.

219.    If CFI funds like those awarded to the City of Phoenix remain unobligated, Arizona's ability to meet applicable air quality standards and reduce statewide GHG emissions will be impeded.

220.    The Arizona Department of Transportation (ADOT) applied for CFI grants in funding round, but did not receive any award. ADOT intends to compete for funding opportunities backed by the FY2026 CFI appropriation when they are announced.

**California**

221.    Like the NEVI Formula Program allocations to California, the CFI and Accelerator awards to the State are important to the success of state climate and environmental policies to reduce climate-changing GHG emissions and smog, as well as state economic and transportation policies to modernize freight movement and improve access to EVs. *See Washington v. USDOT*, Dkt. No. 1 at ¶¶ 125–128 (May 7, 2025). The Charging Program Suspensions harm the State by depriving state agencies of access to millions of federal dollars, stalling the build-out and maintenance of necessary EV charging and hydrogen infrastructure,

---

[14] Arizona Governor's Office of Resiliency, *The Clean Arizona Plan Priority Climate Action Plan State of Arizona* (Mar. 2024), https://resilient.az.gov/sites/default/files/2025-01/the-clean-arizona-plan.pdf.

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

1  increasing the costs of and impeding progress on its policies, and increasing direct harms to the

2  State from climate change and other dangerous air pollution.

3       222.    California's efforts to promote the widespread adoption of zero-emitting EVs

4  are critical to its Climate Change Scoping Plan, developed to meet the California Legislature's

5  GHG reduction targets, and its attainment of federal ambient air quality standards, which

6  require significant measures to reduce smog precursors like nitrogen oxides (NOx) and

7  particulate matter. Failure to attain and maintain these ambient concentrations not only

8  increases public health risks, including cardiovascular and respiratory illnesses; it also risks

9  noncompliance penalties to the State, including the loss of highway funds. 42 U.S.C. §§ 7409,

10  7410, 7509(b); 89 Fed. Reg. 16202, 16223–49 (Mar. 6, 2024) (detailing health effects of

11  particulate matter); 83 Fed. Reg. 17226, 17232–46 (Apr. 18, 2018) (health effects of nitrogen

12  oxides).

13       223.    The California Energy Commission periodically prepares Zero-Emission

14  Vehicle Infrastructure Plans that set forth the State's goals for building out the charging and

15  fueling infrastructure for zero-emission vehicles (including EVs) that will support California's

16  climate and air pollution policies. In the 2024 Zero-Emission Vehicle Infrastructure Plan, the

17  Energy Commission projected 7.1 million plug-in passenger EVs in California in 2030 and

18  15.2 million in 2035.[15] Building out a large and geographically extensive network of public

19  chargers is critical to consumer acceptance of EVs—and thus, critical to the decarbonization of

20  California's light-duty sector (i.e., passenger cars)—given "range anxiety." *See Washington v.*

21  *USDOT*, Dkt. No. 110 at 1–2 (June 24, 2025). The Energy Commission further found that

22  "[e]nsuring a reliable charging experience is critical to encouraging wider adoption of electric

23

24

25

26  [15] Cal. Energy Comm'n, 2024 Zero-Emission Vehicle Infrastructure Plan, CEC-600-2025-002 at 8, 35 (Jan. 2025), https://www.energy.ca.gov/sites/default/files/2025-01/CEC-600-2025-002.pdf.

COMPLAINT                                        47                    ATTORNEY GENERAL OF WASHINGTON
                                                                      Environmental Protection Division
                                                                      800 Fifth Avenue STE 2000
                                                                      Seattle, WA 98104
                                                                      206-464-7744

1     vehicles," as frustration with broken and non-operational EV chargers has an outsized impact

2     on consumer experience.[16]

3           224.     Medium- and heavy-duty vehicles are particularly important to California's

4     transportation and economic policies. These classes include the long-haul freight trucks that

5     move goods along major overland routes, the drayage trucks that constantly transport

6     containers among ports, railyards, and warehouses, and the delivery vans that carry packages

7     from logistics hubs to homes. Many medium- and heavy-duty EVs can be charged at leisure at

8     central depots when they are off-duty, but for others, it is crucial that they can access fast

9     charging at public stations along their routes. Fast-charging an 18-wheeler EV requires

10    significant power, such that constructing these en route chargers carries unique financing,

11    engineering, and permitting challenges. Another zero-emission technology with significant

12    promise for medium- and heavy-duty transportation—the fuel-cell electric powertrain—

13    requires periodic hydrogen refueling.

14           225.     The California Energy Commission's 2024 Zero-Emission Vehicle

15    Infrastructure Plan calls for 109,497 lower-speed depot chargers (20 kW to 150 kW) and 5,527

16    faster chargers along trucking routes (350 kW to 1,500 kW) by 2030. An alternative scenario

17    that builds 4,910 local fast chargers—which would allow drayage trucks, for example, to

18    quickly re-charge while on duty—allows California to forgo over twenty thousand depot

19    chargers.[17] The Plan also calls for a network of hydrogen refueling stations along the top six

20    priority corridors, which represent over 50% of average daily medium- and heavy-duty truck

21    vehicle miles traveled.[18]

22

23

24    [16] 2024 Cal. ZEV Infrastructure Plan, *supra* note 15, at 48; *see* David Ferris, "Why America's EV chargers keep

25    breaking," *E&E News Energywire* (Mar. 29, 2023), https://www.eenews.net/articles/why-americas-ev-chargers-keep-breaking/.

26    [17] 2024 Cal. ZEV Infrastructure Plan, *supra* note 15, at 45.
      [18] 2024 Cal. ZEV Infrastructure Plan, *supra* note 15, at 51–53.

226.    Likewise, California has developed a Sustainable Freight Action Plan, which calls for the deployment of over 100,000 zero-emission freight vehicles by 2030.[19] The California Freight Mobility Plan similarly calls for decarbonization of the commercial freight fleet and last-mile delivery, which depends on available, reliable medium- and heavy-duty EV chargers and hydrogen fueling stations.[20]

227.    In service of these goals, California has applied for and been awarded over $179 million from the CFI and Accelerator grant programs.

228.    As mentioned earlier, California, Oregon, and Washington are the recipients of a $102.4 million tri-state Round 1B CFI Corridor award, announced on August 27, 2024. This award funds the West Coast Truck Charging and Fueling Corridor Project, a build-out of 20 en route fast chargers (160 ports total) for heavy-duty EVs and three hydrogen fueling stations along major goods movement routes across the three States.

229.    California and FHWA executed a grant agreement for this award on or about January 10, 2025, and shortly thereafter, FHWA approved obligations of $697,943.20 for program administration by the Energy Commission and $150,000 to Caltrans for program planning and administration. The unobligated federal funds to California—for pre-construction and construction activities—is approximately $59.4 million. In March 2025, Caltrans submitted a request to obligate $4.8 million of this CFI award for pre-construction activities on the West Coast Truck Charging and Fueling Corridor Project. Since the rejection of those requests on March 31, 2025, *see supra* ¶ 96, California has not been able to advance the Project, delaying and jeopardizing the implementation of its zero-emission freight policies.

230.    California is the recipient of a $55.9 million Round 2 CFI Corridor award announced on January 10, 2025. This award to the Energy Commission funds the installation

---

[19] Gov. Edmund G. Brown, California Sustainable Freight Action Plan at 10 (July 2016), https://ww2.arb.ca.gov/sites/default/files/2019-10/CSFAP_FINAL_07272016.pdf.
[20] Caltrans, California Freight Mobility Plan 2023 at 264 (Sept. 2023), https://dot.ca.gov/-/media/dot-media/programs/transportation-planning/documents/cfmp/cfmp-july-2023-final-v1-a11y.pdf.

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

of 21 en route fast chargers (130 ports total) for heavy-duty EVs and one hydrogen fueling station along California's goods movement corridors and key drayage routes to California's ports. FHWA has not executed an award agreement with the Energy Commission since January, and California has not been able to move forward with planning, solicitations, or other activity under this award.

231.    California is the recipient of a $63.7 million Accelerator award announced on January 18, 2024. This award to Caltrans (jointly administered with the Energy Commission) funds the repair and replacement of an estimated 1,302 public EV charging ports across the state. California and FHWA executed an award agreement on or about March 14, 2024, and shortly thereafter, FHWA obligated $660,101 for the Energy Commission's administrative costs. The Energy Commission used these costs to administer a solicitation for California subawardees to carry out the Accelerator award.

232.    That solicitation closed on February 6, 2025. On March 28, 2025, FHWA informed Caltrans that it had "not received the authorization from FHWA HQ Program Office to proceed forward with" either the CFI or Accelerator programs. *Supra* ¶ 96. Due in part to the uncertainty over the availability of Accelerator funds, the Energy Commission delayed proposing subawards until June 6, 2025, and even then, was able to propose awards amounting to only 10% of the award ($6.2 million).

233.    In addition to the California state agencies mentioned above, nineteen California cities, counties, air districts, and tribes also have CFI Corridor and Community awards. The Corridor awards support the construction of public light-, medium-, and heavy-duty chargers and hydrogen fueling stations along major freight and transportation routes. The Community awards expand access to EV charging in underserved urban and rural communities. The total funding to California awardees across the CFI and Accelerator programs is over $441 million.

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

234.    The loss of these local-level projects harms California by reducing the availability of public EV charging and hydrogen fueling, inhibiting consumer and commercial acceptance of zero-emission vehicles, and delaying California's build-out of charging and fueling infrastructure. Those effects delay and increase the cost of California achieving its transportation and economic policies, particularly for freight movement—a massive piece of California's transportation sector economy. Moreover, the inhibited deployment of zero-emission vehicles increases GHG emissions, smog precursors, and other harmful air pollution, exacerbating climate change and nonattainment of federal air quality standards and jeopardizing California's climate targets and other environmental policies.

**Colorado**

235.    In 2019, the Colorado legislature officially recognized the State is experiencing harmful climate impacts and set statewide GHG reduction goals. The transportation sector is a significant contributor to GHG emissions, smog precursors, and other dangerous air pollutants throughout Colorado. The State has identified transportation electrification as one of the most significant tools to decarbonize the sector, and the widespread adoption of EVs is an important aspect of Colorado's policy to reduce GHG pollution from transportation.

236.    CFI funding supports Colorado's policy goal of reducing GHG emissions in the State's transportation sector, and the State took these grants into account when determining the allocation of its NEVI funding. Widespread EV adoption is limited by the availability of publicly accessible EV charging ports. The Colorado awardees' inability to access CFI funds impedes Colorado's ability to develop a statewide network of EV charging stations. Such a network is necessary to promote EV adoption as required by Colorado's legislature and executive branch.

237.    Moreover, Colorado is interested in applying for future CFI funding, should FHWA make funding from the FY2026 appropriation available in a new funding opportunity.

51                 ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

**Delaware**

238.    Pursuant to the Delaware Climate Change Solutions Act, 7 *Del.C.* Ch. 100 (2023) , the State "shall implement greenhouse gas emission reduction strategies" to ensure that such emissions are reduced by 50% by 2030, and stabilized at net zero emissions by 2050. 7 *Del.C.* § 10003(a), (b). These targets are based on a finding by the General Assembly that it is in the public interest to develop a comprehensive approach to reduce emissions of greenhouse gases in the State and to maximize the State's adaptation and resiliency to the effects of climate change. That approach addresses GHG emissions from industry, power plants, agriculture, and the transportation sector, including motor vehicles.

239.    Delaware has the lowest mean elevation of any state in the nation and is therefore particularly vulnerable to coastal climate change impacts, including sea-level rise, flooding, saltwater intrusion into drinking water and agricultural lands, erosion, wetland loss, beach loss, and extreme storm events. The threat that climate change poses to Delaware is multi-faceted, resulting in disruptions and damage to the State's agriculture industry, water resources, built infrastructure, natural resources, and public health. The threat is pronounced for Delawareans residing in historically over-burdened and under-served communities. 7 *Del.C.* § 10001(a)(2).

240.    The General Assembly further found that climate change poses risks to Delaware's continued economic vitality, including an industrial center and major port, Wilmington, located on the Delaware River, subject to flooding and storm surge; a tourism economy on the Atlantic Beach communities exposed to sea level rise, flooding, and storm impacts; and a robust agriculture sector vulnerable to weather extremes, flooding, and saltwater intrusion.

241.    The continued health and quality of life of Delaware's residents are dependent upon reducing its GHG emissions and maintaining and improving the State's resiliency to the

1    impacts of climate change. Actions taken to reduce GHG emissions and increase resiliency to

2    climate change have co-benefits including economic development, job opportunities, public

3    health and air and water quality.

4              242.    The availability of additional EV charging infrastructure within Delaware

5    would promote and facilitate the goal of reduced GHG emissions, by incentivizing the

6    purchase and use of electric vehicles on Delaware streets and highways. Easy access to

7    charging stations is a critical step in reducing "range anxiety" by reassuring EV owners and

8    users that they will be able to charge their vehicles when needed.

9              243.    Loss of the City of Newark's CFI funds would harm the State of Delaware by

10   undermining the climate change strategy implemented by the State. With limited charging

11   facilities available, consumers would be less likely to purchase electric vehicles. The

12   suspension of CFI projects will lead consumers to purchase and use more vehicles with internal

13   combustion engines, and fewer electric vehicles, due to a lack of sufficient charging options

14   within the City of Newark.

15             244.    The lack of CFI funding for the City of Newark program would prevent the

16   reduction in GHG emissions from increased local use of electric vehicles. The lost reduction in

17   GHG emissions would add to the climate change harms cited by the General Assembly.

18   **District of Columbia**

19             245.    The District of Columbia has set goals to reduce GHG emissions, to address air

20   pollution and reduce the adverse effects of climate change. For example, the Clean Energy

21   D.C. Omnibus Act of 2018, D.C. Code § 50-741 (2019) (as amended), requires public buses,

22   taxis, rideshare vehicles, and large fleets to transition to zero-emission by 2045. In addition, the

23   District aims for at least 25% of all registered vehicles to be zero-emission by 2030. D.C.

24   Code. § 50-921.24 (2024). The District's Climate Commitment Amendment Act of 2022

25   requires the District to be carbon neutral by 2045. D.C. Code § 8-151.09d (2023). And the

26   Comprehensive Electric Vehicle Infrastructure Access, Readiness, and Sustainability

COMPLAINT                                          53

1   Amendment Act of 2024, D.C. Law 25-262 (effective March 7, 2025), seeks to accelerate the

2   adoption of EVs by expanding and improving access to charging infrastructure across the

3   District.

4          246.    Transportation is a major source of carbon pollution in the District of Columbia,

5   contributing to approximately 24% of the District's total greenhouse gas emissions.[21] Vehicle

6   pollution causes health problems, such as cancer and asthma, and contributes to climate

7   change. The transition to electrification of vehicles is critical to the success of the District of

8   Columbia's plans to cut transportation-related GHG emissions.

9          247.    The District relies in part on federal funding, such as CFI funds, to provide

10  funding to strategically deploy EV charging infrastructure and create an interconnected

11  network that supports data collection, access, and reliability.

12         248.    The suspension of these funds undermines the District's efforts to increase EV

13  charging infrastructure and EV adoption in the District and will, in turn, delay the District's

14  timeline for meeting its electrification and GHG reduction goals.

15  **Illinois**

16         249.    Illinois has substantial unmet need for EV charging infrastructure that continues

17  to harm not only its own economy but also the nationwide overland freight industry, much of

18  which flows through Illinois.

19         250.    As of August 2024, there were only four publicly accessible EV charging

20  stations in Illinois capable of charging up to Class 5 electric trucks (e.g., city delivery vans)

21  and no stations capable of charging Class 6–8 electric trucks (e.g., semi tractors). The $100

22  million grant to IEPA was intended to fill this gap in charging capacity, making EV freight

23  viable along priority freight corridors.

24

25

26  ---
    [21] DOEE, *Greenhouse Gas Inventories*, https://doee.dc.gov/am/service/greenhouse-gas-inventories (last visited
    December 14, 2025).

251.    Illinois also needs CFI funds to realize its own state and local plans for economic growth through decarbonization. Illinois signed the Climate and Equitable Jobs Act into law in 2021, Pub. Act 102-0662, which commits the State to deploying 1 million EVs on the road by 2030 and to achieving 100 percent clean energy by 2050. Since the enactment of these goals, Illinois has established multiple plans to accomplish its transportation decarbonization commitments, including the Illinois Electric Vehicle Infrastructure Deployment Plan and the Illinois Priority Climate Action Plan (2024).[22] At the local level, the City of Chicago and the Metropolitan Mayors Caucus have developed Climate Action Plans for the City and broader Chicago region.

252.    The loss of CFI funds will harm Illinois's economy and its efforts to achieve decarbonization goals mandated by state law. The IEPA grant alone was estimated to bring about emission reductions yielding up to $21 million in positive annual health effects via reduced rates of asthma, hay fever, and respiratory-related emergency room visits. Further, station construction under the IEPA grant was expected to create 198 temporary station development jobs and support over 30 ongoing operations and maintenance jobs.

**Maryland**

253.    Maryland has a significant interest in building the charging infrastructure that would be funded by the CFI and Accelerator programs. The state has seen an almost 900% increase in the number of EVs registered in state over the past five years: from 14,930 EVs in 2020 to more than 132,973 EVs in 2025. And the state has a goal of registering 1.1 million passenger EVs by 2031.

254.    EV adoption is a key method by which the state plans to reduce pollution from the transportation sector. In 2020, transportation was the source of over one third of Maryland's GHG emissions and a significant source of smog forming air pollution.

---

[22] *See, e.g.*, Priority Climate Action Plan at 53 (2024) (discussing NEVI and CFI funds), https://epa.illinois.gov/content/dam/soi/en/web/epa/topics/climate/documents/Illinois%20Priority%20Climate%20Action%20Plan.pdf.

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

255.    As described above, Maryland was directly awarded over $56 million in funding through the CFI and Accelerator programs. Most of this funding would support the deployment of community and corridor charging for passenger vehicles. Additionally, Maryland's Round 2 CFI grant would be used to develop charging depots along a heavily used freight corridor, allowing industry to reduce freight emissions via electrification.

256.    These projects would increase the availability of the infrastructure necessary to support vehicle electrification and reduce pollution from the transportation sector. If these projects are further delayed, such delay may in turn harm Maryland's ability to meet its emission reduction and vehicle electrification goals.

**Massachusetts**

257.    The CFI award to MassDOT is important to the success of Massachusetts's climate and environmental policies to reduce climate-changing GHG emissions and pollution from other air pollutants. Due to current budgetary constraints, without this grant, Massachusetts will be unable to implement this project in the near term, if at all.

258.    Massachusetts state law requires significant reductions in GHG emissions from 1990 levels by 2050, with interim emissions limits by sector. Mass. Gen. Laws ch. 21N § 3.

259.    To achieve these statutory targets, the Commonwealth's Clean Energy and Climate Plan targets having 97% of light-duty vehicles in the state electrified by 2050. This plan, in turn, relies on building out accessible public charging infrastructure.[23] Suspension of federal funding for EV charging infrastructure, including the CFI program, will disrupt Massachusetts' comprehensive statewide planning efforts to achieve its climate, economic, and transportation policy goals.

260.    Massachusetts's 1,500 miles of coastline are vulnerable to sea-level rise and increasingly frequent extreme weather events attributed to climate change. Over the twenty-

---

[23] Mass. Exec. Office of Energy & Envt. Affairs, *Clean Energy and Climate Plan for 2050* (Dec. 2022), https://www.mass.gov/doc/2050-clean-energy-and-climate-plan/download.

1    first century, Massachusetts is projected to experience approximately 4.0 to 7.6 feet of sea-

2    level rise, with estimates of coastal property damage expected to reach over $1 billion per year

3    by the 2070s. Flooding due to climate change will harm the approximately 177

4    Commonwealth-owned parks, beaches, reservations, wildlife refuges, roads, parkways, piers

5    and dams, and necessitate increasing expenditures to protect, repair, and rebuild the

6    Commonwealth's properties, expected to increase to about $17 million in the 2030s.

7        261.    MassDOT anticipates that the CFI project would reduce GHG emissions by

8    3,178 short tons, decrease carbon monoxide by over 27,775 pounds, and reduce other air

9    pollution caused by internal combustion engines in the transportation sector. The loss of CFI

10   funds will thus increase direct harms to Massachusetts's residents and Massachusetts itself

11   from climate change and from increased localized pollution from internal combustion engines.

12   **Michigan**

13       262.    As is true of other states, the CFI and Accelerator awards to Michigan are

14   important to achieving its environmental policies and goals, as well as its desire to build,

15   maintain, and modernize Michigan's transportation infrastructure. Advancing transportation

16   electrification as a critical element of Michigan's broader climate strategy.[24] Indeed, it is

17   Michigan's policy that modernizing its energy and transportation networks is part and parcel of

18   improving economic mobility.[25]

19       263.    In 2022, the Michigan Department of Environment, Great Lakes, and Energy

20   (EGLE) published its "MI Healthy Climate Plan," which contains a "Roadmap to 2030"

21   indicating its intent to, among other things, "make unprecedented investments in electric

22   vehicle charging infrastructure" in part by leveraging "public funding opportunities" like the

23

24   ───────────────

[24] *See, e.g.*, Mich. Dep't of Env't, Great Lakes, & Energy, *Optimized EV Charger Placement Plan*,
25   https://www.michigan.gov/egle/about/organization/materials-management/energy/transportation/optimized-ev-charger-placement-plan.
[25] *See* Mich. Office of Future Mobility & Electrification, *MI Future Mobility Plan 2.0*, at 3,
26   https://www.michiganbusiness.org/globalassets/documents/mobility/mi-future-2-250808.pdf.

COMPLAINT                    57              ATTORNEY GENERAL OF WASHINGTON
                                            Environmental Protection Division
                                            800 Fifth Avenue STE 2000
                                            Seattle, WA 98104
                                            206-464-7744

grants at issue.[26] Michigan's climate plan calls for EV charging infrastructure to support two million electric vehicles on its roads by 2030.[27]

264.    It is important to Michigan that these investments be made as soon as possible. In addition to generating a quicker and better return for Michigan, getting grant obligations back on schedule will have a budgetary benefit: Future EV charging infrastructure projects are likely to face increased construction, equipment, and labor costs due to inflation and ongoing supply chain instability.

265.    The loss of these federally funded programs will significantly impede Michigan's efforts to achieve its goals. If the CFI and Accelerator awards remain unobligated, Michigan will be unable to cover the shortfall using other funds, and, at best, its EV charging network will expand too slowly to permit Michigan to reach its climate goals. At worst, that network will actually deteriorate, as certain of these grants are intended for maintenance and repair.

**New Jersey**

266.    So too for New Jersey, the loss of CFI and Accelerator awards to the state harms New Jersey's efforts to further modernize its transportation infrastructure and hampers its ability to meet its transportation and environmental goals.

267.    In May of 2024, the NJDEP published its latest "Roadmap to Zero-Emission Medium- and Heavy-Duty Vehicles in New Jersey."[28] That report sets out New Jersey's goal of "reducing statewide $CO_2$[-equivalent] emissions by 80% by 2050, compared to a 2006 baseline."[29]

---

[26] EGLE, *Mi Healthy Climate Plan* at 37 (2022), https://www.michigan.gov/egle/-/media/Project/Websites/egle/Documents/Offices/OCE/MI-Healthy-Climate-Plan.pdf.
[27] *Id.* at 39.
[28] N.J. Dep't of Env'tl Protection, *A Roadmap to Zero- Emission Medium- and Heavy-Duty Vehicles in New Jersey*, https://dep.nj.gov/wp-content/uploads/drivegreen/pdf/mhd-roadmap.pdf
[29] *Id.* at 3.

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

268.    As part of its efforts to meet that goal, the State has implemented a number of programs to set the State on a pathway towards zero-emissions vehicle adoption, including programs to address funding gaps for charging infrastructure.[30] That report specifically lists the CFI grant program as being among the funding opportunities available to New Jersey to facilitate meeting its environmental and transportation goals.[31]

269.    Increasing zero-emission vehicle adoption—especially of zero-emission heavy-duty vehicles—also benefits public health. Diesel-powered heavy-duty vehicles emit fine particulate matter, black carbon, and NOx, an ozone precursor. Exposure to these pollutants increases the risk of heart and lung illnesses and premature death for thousands of New Jersey residents.[32]

270.    The loss of these grants will impede New Jersey's efforts to achieve its goals, slowing the implementation of critical zero-emission vehicle charging infrastructure or forcing the State to find scarce state funds to cover the shortfall.

**New York**

271.    To support the growing number of EVs on the road in New York State and to continue to encourage more car buyers to switch to EVs, the State of New York has sought to invest in expanding the network of public charging stations available to drivers.

272.    Since 2015, New York has increased the number of public EV charging stations in the state from about 1,300 to more than 18,000 today, but even that massive increase in charging stations has not kept pace with the increase in EVs on the road, which now stands at over 320,000.

273.    While the initial NEVI plan largely focused on DCFC fast charging stations along the EV alternative fuel corridors, there is also growing demand for Level 2 chargers. The

---

[30] *Id.*

[31] *Id.* at 26.

[32] *Id.* at 6.

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

1    Round 1A CFI award to NYSERDA was intended to address statewide gaps in the network for

2    both Level 2 and local community DCFC charging.

3    274.    NYSERDA had identified specific needs for additional charging stations in

4    New York State that can directly address some of the gaps in the State's charging

5    infrastructure and address priority needs: DCFC stations in small- to medium-sized cities that

6    currently have no local DCFC options; Level 2 stations at tourist destinations such as state

7    parks, hotels, and other long-dwell time travel locations; and Level 2 stations at municipal

8    parking locations that serve as highly visible EV beacons in their communities, increasing

9    drivers' comfort with the idea of owning an EV.

10    275.    DCFC stations in smaller cities can provide the additional security needed for

11    residents to buy EVs or for local fleets to electrify, especially those who do not have access to

12    home charging.

13    276.    These DCFC and Level 2 municipal locations primarily serve disadvantaged

14    and rural communities and expand the availability of EV charging to parts of the state that

15    currently lack infrastructure.

16    277.    Of 17,000 hotels in the state, only 390—less than 2%—have chargers.

17    Expanding charging stations at hotels is a crucial part of electrifying long-distance road travel,

18    and installing Level 2 stations at long dwell-time travel locations complements the DCFC

19    stations being built along designated alternative fuel corridors by enabling additional long-

20    distance travel to these locations and reducing the need for DCFC along these routes, while

21    also providing lower-cost options that are more convenient to travelers than en route charging.

22    278.    While NYSERDA has been able to work with local municipalities originally

23    identified in the grant application to satisfy NEPA requirements for their sites, there has not

24    been any construction funds obligated to move forward with these projects. The ongoing

25    months of delays add to the burden of uncertainty for local partners who are not able to

26    proceed with securing equipment and installing the chargers.

279.    Furthermore, the ongoing delays resulting from the CFI Program being under "program review" has led NYSERDA to wait to identify additional sites for funding. Each passing day of this pause makes it more difficult for NYSERDA to complete all administrative tasks required to identify sites, conduct NEPA reviews, and obligate the funds before critical deadlines in late 2026. If NYSERDA does not meet these deadlines, it will put any remaining unobligated funding at risk of being revoked.

280.    FHWA's refusal to advance SUNY's CFI Round 2 Community award to an executed grant agreement directly injures SUNY financially and operationally. SUNY structured its EV charging initiative around the $15 million CFI award and committed to providing a 20% non-federal match. Those matching funds, together with staff time already expended to scope, plan, and begin implementation of the project, are now stranded.

281.    SUNY cannot readily replace this federal investment from its own constrained capital resources and, absent the CFI funds, must either divert scarce dollars from other higher-education priorities or accept a sharply scaled-down, piecemeal deployment of EV chargers. The CFI program is designed to complement the NEVI Formula Program by funding Community and Corridor projects—including projects like SUNY's campus-focused deployment—that formula funding does not cover. FHWA's suspension of SUNY's CFI award therefore leaves SUNY without any equivalent federal funding source for the planned chargers.

282.    The loss of SUNY's CFI-funded project also inflicts environmental and community harms. SUNY's 64 campuses have facilities in over 400 distinct locations across New York State, many of which function as compact communities with strong ties to the surrounding region. Nearly half of SUNY's main campuses have on-campus residential populations totaling more than 80,000 students who live on campus for nine to twelve months each year. SUNY campuses are often major employers and hubs of local activity; locating public-facing EV chargers on those campuses would provide reliable charging for students,

1   faculty, staff, visitors, and residents of nearby neighborhoods, while also supporting SUNY's

2   transition of campus operational fleets to EVs.

3          283.    By preventing obligation of SUNY's CFI award, Defendants delay deployment

4   of hundreds of EV charging ports in these communities, impede EV adoption, and frustrate

5   New York State's GHG reduction mandates and air-quality objectives, including attainment

6   and maintenance of federal air quality standards in areas affected by transportation emissions.

7          284.    FHWA's handling of SUNY's CFI award also inflicts institutional harms.

8   FHWA publicly announced the award, posted it on the agency's website for months, and

9   generated press coverage describing federal funding for 350 EV chargers on SUNY campuses,

10  all of which created legitimate expectations among SUNY, State officials, students, and the

11  public that the project would proceed. SUNY acted on those expectations by mobilizing

12  campuses and staff to plan the project and reserving matching funds. FHWA's subsequent

13  categorical refusal to act on CFI grant agreements, coupled with its repeated statements that

14  announced awards remain under indefinite "review" without further explanation or

15  engagement, leaves SUNY's project in limbo, and disrupts SUNY's capital and climate

16  planning.

17  **Oregon**

18         285.    For nearly 20 years, Oregon has actively pursued multi-pronged strategies to

19  reduce harmful GHG emissions in this state. In 2007, the Oregon Legislature established GHG

20  reduction goals through Oregon Revised Statute § 468A.205. These goals include a reduction

21  in GHG emissions of at least 75% below 1990 levels by 2050. In 2010, the Oregon Legislature

22  directed ODOT and the Oregon Transportation Commission to adopt a comprehensive

23  statewide transportation strategy on GHG emissions to aid in achieving these goals. Or. Rev.

24  Stat. § 184.617(j). The result was Oregon's Statewide Transportation Strategy, which identifies

25  the pathways for reducing transportation-related emissions, including cleaner vehicles and

26

1  fuels, efficient systems and operations, low-carbon transportation options, conducive land use

2  management, and pricing mechanisms.[33]

3       286.    Emissions from the transportation sector are the largest sources of GHG

4  emissions, smog precursors, and other dangerous pollutant emissions in Oregon.

5  Transportation GHG emissions account for more than 35% of Oregon's total emissions, at 21.5

6  million metric tons (MMT) of $CO_2$-equivalent emissions. Despite accounting for just 9% of the

7  total registered vehicle fleet of 4.1 million vehicles, Oregon's 380,500 medium- and heavy-

8  duty trucks produce 9.3 MMT of GHG emissions annually, which is 43% of the transportation

9  emissions and 15% of total GHG emissions.

10      287.    In 2018, ODOT evaluated its overall progress in implementing the Statewide

11 Transportation Strategy and found that more intense and focused efforts were needed to help

12 reach Oregon's GHG reduction goals. Cleaner vehicles and fuels were identified as the most

13 impactful actions, with the potential to make up about half of the gap needed to reach

14 Statewide Transportation Strategy targets.

15      288.    The Interstate-5 corridor provides a significant opportunity to support the

16 transition to medium- and heavy-duty zero-emission vehicles. Interstate-5 is the major corridor

17 running north and south through western Oregon, spanning 308 miles from the California

18 border to the Washington border, and intersecting Oregon's three most populous cities;

19 Eugene, Salem, and Portland. It carries the highest number of vehicles relative to any other

20 interstate or highway in Oregon and has direct connections to Oregon's other major freight

21 corridors, Interstate-84, Interstate-205, and Interstate-405. ODOT has estimated that Interstate-

22 5 has the greatest portion of long-distance travel in Oregon, representing 40% of statewide

23 long-distance vehicle miles traveled. Nearly all of Interstate-5, from Portland to Medford,

24 receives 7,500 or more daily heavy-vehicle trips.

25  _____

[33] ODOT, *Oregon Statewide Transportation Strategy Oregon Department of Transportation A 2050 Vision for Greenhouse Gas Emissions Reduction* 13–14 (Mar. 20, 2013),

26 https://www.oregon.gov/odot/climate/Documents/Oregon_Statewide_Transportation_Strategy.pdf.

COMPLAINT                          63

289.    At the time of ODOT's CFI application, there were only 4 focused medium- and heavy-duty charging stations across the three states, and 3 hydrogen refueling stations.

290.    ODOT's ability to create funding opportunities for private-sector partners to build medium- and heavy-duty EV charging and hydrogen refueling infrastructure—specifically through the tri-state Round 1B CFI West Coast Clean Truck Charging and Fueling Infrastructure project—has been significantly undermined by FHWA's delays in obligating CFI funds. Public attention to the expiration of the availability period for FY2022 CFI appropriation has alarmed potential applicants and raised concerns that ODOT's FY2024 construction funds may face a similar risk of lapse.

291.    Applicants and site hosts, who must invest substantial time and resources into preparing proposals, are increasingly skeptical of the reliability of federal funding unless construction dollars are fully obligated.

292.    At the same time, ODOT's administrative burden has grown due to the broader lack of action by FHWA to obligate CFI awards across states. ODOT has had to devote additional time and resources to safeguard timely obligation of its own CFI construction funds and to maintain trust with the applicant community. This uncertainty has also delayed development and release of ODOT's Notices of Funding Opportunity for medium- and heavy-duty EV charging and fueling infrastructure.

293.    As time passes, project delivery costs increase, and private-sector partners' interest and financial capacity diminish. Continued funding delays and uncertainty make it more challenging for ODOT to effectively develop, promote, and attract participation in medium- and heavy-duty EV charging and hydrogen refueling infrastructure projects.

294.    ODOT expects there will be challenges securing future contracts due to uncertainty regarding the status of the CFI program. Without the ability to obligate construction funding, contractors have no incentive to apply to the program.

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

**Pennsylvania**

295.    PennDOT is a direct recipient of an $18.6 million CFI award and a $5 million Accelerator award. The Charging Program Suspensions therefore deprive PennDOT of access to millions of federal dollars.

296.    Because the Commonwealth cannot cover the loss of federal dollars, the Charging Program Suspensions stalls the build-out and maintenance of necessary transportation infrastructure that advances the Commonwealth's economic needs and serves its environmental objectives, including those identified in PennDOT's Carbon Reduction Strategy[34] and the Pennsylvania Department of Environmental Protection's Climate Action Plan.[35]

297.    The loss of funding will impede these goals.

**Rhode Island**

298.    As with other states' awards, Rhode Island's CFI award is important in its efforts to achieve state climate and environmental goals, as well as its work to build out effective and modern transportation infrastructure.

299.    Rhode Island is steadfast in its commitment to combat climate change and its harmful effects. To that end, the 2021 Act on Climate sets aggressive decarbonization requirements for the State. *See* R.I. Gen. Laws § 42-6.2-1, *et. seq*. This includes mandates that statewide GHG emissions reach 45% below 1990 levels by 2030; 80% below 1990 levels by 2040, and that the State achieves net-zero emissions by 2050. *See* R.I. Gen. Laws § 42-6.2-9.

300.    In furtherance of its climate goals, Rhode Island is also firmly committed to reducing transportation-sector GHG emissions. Advancing transportation electrification is a critical element of its broader climate strategy. Transportation emissions account for over thirty

---

[34] *See, e.g.*, PennDOT, *Pennsylvania Carbon Reduction Strategy* 24 (Nov. 2023), https://www.pa.gov/content/dam/copapwp-pagov/en/penndot/documents/research-planning-innovation/planning/documents/2023%20penndot%20pa%20carbon%20reduction%20strategy.pdf.
[35] Penn. Dep't of Envtl. Protection, *Pennsylvania Climate Action Plan* 91–100 (2024), available at https://www.pa.gov/agencies/dep/residents/climate-change/pa-climate-action-plan.

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

1  percent (30%) of Rhode Island's total GHG emissions, making it the largest single source of

2  emissions in the state.

3    301.    Delays in EV charging infrastructure deployment caused by the Defendants'

4  unlawful actions jeopardize the Rhode Island's ability to meet its GHG reduction mandates

5  under the Act on Climate, as well as other regional air quality improvement goals.

6    302.    Additionally, future EV charging infrastructure projects are likely to face

7  increased construction, equipment, and labor costs due to inflation and ongoing supply chain

8  instability.

9    303.    Delays in education and workforce development efforts also undermine

10  economic development opportunities in Rhode Island tied to growth of the clean transportation

11  sector.

12    304.    As a result of being unable to receive and obligate CFI funds, Rhode Island has

13  been unable to move forward with its Charging Ahead program, keeping funds and benefits

14  from communities and public entities that invested time and resources in development of the

15  program plan.

16  **Vermont**

17    305.    Vermont has long supported the deployment of EVs and other zero-emissions

18  vehicles across multiple vehicle classes as a means of reducing the environment effects of the

19  transportation sector, supporting the State's economy, and achieving its state greenhouse gas

20  emissions reductions targets. For example, since 2020, Vermont has appropriated over $27

21  million for the State of Vermont Clean Transportation Incentive Program, which incentivizes

22  consumers to transition to cleaner vehicles like plug-in hybrids and EVs.

23    306.    The State's current Comprehensive Energy Plan also calls for "vast expansion

24  of the state's charging network" to increase use of EVs, recognizing the economic benefit of

25  EVs to Vermont and the environmental benefits of EVs beyond reduction of greenhouse gas

26

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

emissions.[36] State policies like Vermont's Renewable Energy Standard Tier III program, *see* Vt. Stat. Ann. tit. 30, § 8005(a)(3), provide regulatory support for investment in the deployment of EVs and EV charging stations by utilities such as Burlington Electric Department to reduce GHG emissions by utility customers and achieve state emission reduction goals.

307.    Indeed, Vermont has been a leader in public EV charging deployment. In the Fall of 2021, Vermont's Agency of Transportation developed a ten-year, statewide Electric Vehicle Supply Equipment development plan, which later became the foundation of its NEVI Formula Program Plan.

308.    Moreover, the State's Global Warming Solutions Act, 2020 Vt. Acts & Resolves, No. 153, requires the State to significantly reduce GHG emissions below historic levels in the coming decades, and the State has prepared a Climate Action Plan to identify steps to meet those goals. Development of EV charging infrastructure to support transportation electrification is a Climate Action Plan priority.[37] In implementing the Climate Action Plan, the State has identified an EV "deployment" goal, which depends on further development of EV charging infrastructure.

309.    The City of Burlington is Vermont's largest municipality, a major economic center, and an important piece of Vermont's overall EV charging network plans. Indeed, robust EV charging capability in Burlington is particularly important to the State's overall EV adoption targets because of the City's size, density, and demographics.

310.    Building out a large and geographically extensive network of public chargers is critical to consumer acceptance of EVs. Loss of the $4.89 million CFI award in Burlington will

---

[36] Vt. Dep't of Pub. Serv., *2022 Vermont Comprehensive Energy Plan* 118–20 (Jan. 15, 2022), https://publicservice.vermont.gov/sites/dps/files/documents/2022VermontComprehensiveEnergyPlan_0.pdf.
[37] Vt. Climate Council, *Vermont Climate Action Plan 2025* at 110 (2025), https://outside.vermont.gov/agency/anr/climatecouncil/Shared%20Documents/Vermont_Climate_Council/CAP2025_ChapterDrafts/ClimateActionPlanUpdate_2025.pdf.

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

1   create a significant hole in Vermont's EV charging capacity that will need to be filled with

2   other sources of capacity and funds.

3        311.    In carrying out its state-level planning efforts for the development of its EV

4   charging network, the State counted on Burlington's CFI award to support EV charging

5   capacity in Burlington. In January 2025, for example, the Vermont Agency of Transportation

6   assumed that Burlington's CFI award would be implemented in a report updating the

7   legislature on progress toward statewide EV adoption goals and identifying remaining capacity

8   needs. Thus, loss of the charging capacity to be developed by CFI award deprives the State of

9   nearly $5 million worth of charging capacity it will need to make up if it is to achieve is EV

10  deployment goals. At a minimum, loss of the funding will delay and increase the cost to

11  Vermont of meeting is EV charging capacity goals.

12       312.    Vermont also applied for CFI grants in funding rounds 1A and 1B, coordinating

13  with BED to avoid substantial overlap, but did not receive those grants. The State intends to

14  apply for CFI grants in future rounds of funding backed by the $700 million FY2026 CFI

15  appropriation, as well as any funding opportunities backed by the 10% set-aside from FY2024-

16  FY2026 NEVI appropriations.

17  **Washington**

18       313.    Much like its NEVI Formula Program funding, Washington's CFI award

19  funding is critical to its ability to implement state climate and environmental policies to reduce

20  carbon pollution, as well as to the State's general goals of combatting climate change and

21  protecting the health and welfare of its residents. *See Washington v. USDOT*, Dkt. No. 1 at

22  ¶¶ 117–123 (May 7, 2025).

23       314.    Washington is committed to tackling human contributions to climate change

24  and air pollution and has set ambitious goals to reduce GHG emissions. In 2020, the

25  Washington Legislature set new greenhouse gas emission limits requiring the State to reduce

26

1    emission levels by 45% by 2030; 70% by 2040; and 95% by 2050, achieving net zero

2    emissions, as measured against 1990 levels. *See* RCW 70A.45.020.

3        315.    Washington's transportation system is the State's largest source of climate

4    pollution, accounting for 39.7% of all emissions, according to its most recent GHG inventory

5    in 2021. On-road GHG emissions make up approximately 58% of the State's transportation

6    sector emissions. This pollution causes health problems, such as cancer and asthma, and

7    contributes to climate change.

8        316.    The trucking sector has a particularly deleterious effect on human health and the

9    environment. Trucking alone accounts for 10% of all emissions, contributing 59% of on-road

10   NOx and 53% of on-road particulate matter.

11       317.    Washington's current State Freight System Plan forecasts that between 2022

12   and 2050, freight movements in Washington are expected to increase by 45%, from 603

13   million tons of cargo to 872 million tons. In addition, forecasted truck vehicle miles traveled

14   are expected to increase by 67% between 2022 and 2050.[38]

15       318.    The transition to electrification of all vehicles is critically important to the

16   success of Washington's plans to cut transportation-related GHG emissions. Washington ranks

17   in the top five in the nation for EV adoption. In 2024, one in five new cars sold in Washington

18   was a plug-in electric vehicle.

19       319.    Washington has recognized that the transition to electric vehicles requires

20   accessible and affordable charging and refueling infrastructure. Washington currently has

21   approximately 1,460 public DCFC ports, which is less than half of the State's goal of 3,030

22   DCFC ports by 2025. The State anticipates the need for 8,000 DCFCs in 2030 and 12,000 in

23   2035 to meet future demand. Washington currently does not have any fast-charging sites for

24   medium and heavy-duty trucks.

25

26   [38] Wash. Dep't of Transp., *Washington State Freight System Plan* 48 (2022),
     https://wsdot.wa.gov/sites/default/files/2022-12/WA-State-Freight-System-Plan-2022_0.pdf.

COMPLAINT                                    69                    ATTORNEY GENERAL OF WASHINGTON
                                                                      Environmental Protection Division
                                                                        800 Fifth Avenue STE 2000
                                                                           Seattle, WA 98104
                                                                             206-464-7744

320.    Washington's State Freight System Plan outlines existing freight related greenhouse gas emission and mitigation efforts within the long-haul, regional delivery, state ferries, and port cargo handling equipment sectors. The Plan emphasizes the immediate need for infrastructure to support the electrification of freight transportation systems.

321.    Washington remains committed to building out EV charging infrastructure. Washington's ability to make this transition is significantly hampered by the suspension of the CFI program.

322.    Any suspension of CFI funding substantially disrupts the State's ability to mitigate the environmental, health, and economic damages caused by transportation emissions, meet its own GHG emission limits, and make the critical transition to an electrification of transportation.

**Wisconsin**

323.    In August 2019, Governor Tony Evers issued Executive Order #38, directing the Wisconsin Office of Sustainability and Clean Energy to develop a comprehensive Clean Energy Plan.[39] The plan identifies "accelerat[ing] electric vehicle adoption" as one of its primary strategies and depends on collective efforts to reach emissions reduction targets, lessen climate change impacts, and promote clean energy.[40]

324.    Local governments play a key role in reaching these goals. Additionally, the Wisconsin Department of Transportation (WisDOT) works with municipalities throughout the state to coordinate projects and activities related to transportation infrastructure and to facilitate Connect 2050, a comprehensive state plan to maximize "safe and efficient movement of people and products throughout the state in a way that enhances economic productivity, transportation

---

[39] *See* Wis. Off. of Sustainability & Clean Energy, *2025 Clean Energy Plan* 3 (Apr. 2022), https://osce.wi.gov/Documents/Clean%20Energy%20Plan%20-%20DML%20-%20Summary%20%281%29.pdf.
[40] *Id.* at 9 ¶6.

1    accessibility, and the quality of Wisconsin's communities while minimizing impacts to the

2    natural environment and socioeconomic, historic, and cultural resources."[41]

3          325.    Milwaukee and Dane County are both stakeholders in WisDOT's work and

4    actively participate in project planning for state initiatives, including the NEVI rollout. The

5    loss of local-level CFI projects in these high-travel areas of the state harms Wisconsin by

6    reducing the availability of EV charging and hydrogen fueling, inhibiting consumer and

7    commercial acceptance of zero-emission vehicles, and delaying Wisconsin's build-out of

8    charging and fueling infrastructure. Those effects create delay and increase the cost of

9    Wisconsin achieving its transportation and economic policies, undermining the goals set forth

10   in Connect 2050.  Moreover, the inhibited deployment of zero-emission vehicles increases

11   emissions of greenhouse gases, smog precursors, and other harmful air pollution, jeopardizing

12   Wisconsin's climate targets, attainment of federal air quality standards, and other

13   environmental policies.

14         326.    WisDOT has plans to compete for FY2026 funding opportunities for CFI

15   Corridor grants when they are announced.

16         327.    As the above allegations show, the Charging Program Suspensions injure

17   Plaintiff States by depriving them of access to federal funds, impeding their EV charging

18   infrastructure build-outs, and making it more difficult and costly to achieve longstanding

19   climate, environmental, and transportation policies, including meeting decarbonization targets

20   set by state law and ozone and particulate matter ambient air quality standards set by federal

21   law.

22                            **CAUSES OF ACTION**
                                   **COUNT I**
23                      **Violation of Separation of Powers**
                            **(Against All Defendants)**
24

25   _____

26   [41] *See* Wis. Dept. of Transp. Bureau of Planning and Econ. Dev., *Connect 2050* 1 (May 2022),
     https://www.wisdotplans.gov/plan/connect-2050.

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

328.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

329.    Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr.*, Inc., 575 U.S. 320, 326–27 (2015); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing equitable right to relief to challenge unconstitutional governmental action, including under the Appointments Clause and separation-of-powers principles); *Collins v. Yellen*, 594 U.S. 220, 263 n.1 (2021) (Thomas, J., concurring) (same); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) (equitable relief "has long been recognized as the proper means for preventing entities from acting unconstitutionally"); *Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution.").

330.    The Constitution "grants the power of the purse to Congress, not the President." *City & County of S.F.*, 897 F.3d at 1231. The President does not have the unilateral authority to refuse to spend funds. *In re Aiken Cnty*, 725 F.3d at 261 n.1 (Kavanaugh, J.).

331.    The Charging Program Suspensions are premised on the Executive Branch's incorrect assertion that the Constitution permits it to indefinitely freeze, suspend, and refuse to obligate money appropriated by Congress.

332.    By unilaterally, categorically, and indefinitely freezing, suspending, and refusing to obligate appropriated funds without authorization from Congress, the Defendants violate the separation of powers.

333.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Charging Program Suspensions violate the separation-of-powers doctrine. Plaintiff States are further entitled to a permanent injunction preventing Defendants from maintaining the Charging Program Suspensions, whether through the March Guidance Memo review

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

1   mechanism or any other implementing action.

2
### COUNT II
### Violation of the Presentment Clauses
3
### (Against All Defendants)

4      334.    Plaintiffs incorporate by reference the allegations contained in the preceding

5   paragraphs.

6      335.    Federal courts possess the power in equity to "grant injunctive relief . . . with

7   respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27.

8      336.    The Constitution prescribes a "single, finely wrought and exhaustively

9   considered[] procedure" for enacting legislation: passage of a bill by both houses of Congress

10   and presentment to the President for his signature or veto. *Clinton*, 524 U.S. at 439–40

11   (quoting *Chadha*, 462 U.S. at 951); *see* U.S. Const. art. I, § 7, cls. 2, 3.

12      337.    This procedure is exclusive. The Executive Branch's actions to unilaterally,

13   categorically, and indefinitely freeze, suspend, and refuse to obligate CFI and Accelerator

14   funds violate the Presentment Clauses as they constitute an attempt "to enact, to amend, or to

15   repeal [appropriations]" that the Executive Branch dislikes without following the "finely

16   wrought" procedures for doing so. *Clinton*, 524 U.S. at 438–40.

17      338.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that

18   the Charging Program Suspensions violate the Presentment Clauses. Plaintiff States are further

19   entitled to a permanent injunction preventing Defendants from maintaining the Charging

20   Program Suspensions, whether through the March Guidance Memo review mechanism or any

21   other implementing action.

22
### COUNT III
### Violation of the Take Care Clause
23
### (Against All Defendants)

24      339.    Plaintiffs incorporate by reference the allegations contained in the preceding

25   paragraphs.

26      340.    Federal courts possess the power in equity to "grant injunctive relief . . . with

COMPLAINT            73            ATTORNEY GENERAL OF WASHINGTON

1    respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27.

2    341.    The Executive Branch must "take Care that the laws be faithfully executed."

3    U.S. Const. Art. II, § 3. "Under our system of government, Congress makes the laws and the

4    President . . . faithfully executes them." *Util. Air Regul. Grp.*, 573 U.S. at 327.

5    342.    Pursuant to the Take Care Clause, the Executive Branch has a duty to take all

6    necessary steps to obligate congressionally appropriated funds for the purposes and within the

7    time periods defined by statute. Only Congress, through statute, may authorize the Executive

8    Branch not to obligate or spend appropriated funds. By unilaterally, categorically, and

9    indefinitely freezing, suspending, and refusing to obligate congressionally appropriated funds,

10   Defendants violate the Take Care Clause.

11   343.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that

12   the Charging Program Suspensions violate the Take Care Clause. Plaintiff States are further

13   entitled to a permanent injunction preventing Defendants from maintaining the Charging

14   Program Suspensions, whether through the March Guidance Memo review mechanism or any

15   other implementing action.

16                                    **COUNT IV**
17              **Administrative Procedure Act, 5 U.S.C. § 706(2)(A)–(C)**
                              **Unlawful Agency Action**
18             **(Against Agency Defendants and the United States)**

19   344.    Plaintiffs incorporate by reference the allegations contained in the preceding

20   paragraphs.

21   345.    Defendants' actions to carry out the President's directive in Section 7 of the

22   *Unleashing* EO to freeze the disbursement of NEVI and CFI funds—including without

23   limitation issuance of the January 29, 2025 memorandum "Implementation of Executive

24   Orders Addressing Energy, Climate Change, Diversity, and Gender," DOT Order 2100.7, and

25   the March Guidance Memo, as well as the directives and decisions implementing and applying

26   these memoranda and orders to the CFI and Accelerator programs—constitute final agency

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

actions subject to judicial review.

346.    The Charging Program Suspensions, whether memorialized in the above and/or other directives, constitute final agency action subject to judicial review.

347.    The APA requires courts to "hold unlawful and set aside" agency actions that are arbitrary, capricious, an abuse of discretion, or are contrary to law, to constitutional right, power, privilege or immunity, or are in excess of statutory jurisdiction, authority or limitation, or fall short of statutory right. 5 U.S.C. § 706(2)(A)–(C).

348.    Defendants have taken unconstitutional and unlawful actions by unilaterally, categorically, and indefinitely freezing, suspending, and refusing to obligate congressionally appropriated funds without authorization from Congress, including by ceasing the execution of award agreements, rejecting or withholding approval on awardees' requests for obligation, subjecting CFI and Accelerator awards to indefinite internal review, and failing to conduct solicitations for still available appropriations.

349.    Thus, through the Charging Program Suspensions, Defendants acted contrary to constitutional authority.

350.    Through the Charging Program Suspensions, Defendants acted in excess of statutory authority. The Executive Branch lacks statutory authority to freeze, suspend, or refuse to obligate congressionally appropriated funds for the purposes and within the time periods specified by statute.

351.    Specifically, the Charging Program Suspensions violate the statutory mandates in the IIJA to "establish" and "carry out" these programs and "administer" these funds. 135 Stat. at 1421, 1425; 23 U.S.C. § 151(f)(2).

352.    Through the Charging Program Suspensions, Defendants acted without observance of required procedure, including grant management procedures under 2 C.F.R. § 200.204, § 200.308, and § 200.339.

353.    Through the Charging Program Suspensions, Defendants also acted arbitrarily

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

1    and capriciously. Defendants failed to engage in reasoned decision making, failed to provide

2    notice to awardees or reasoned justification for their actions, failed to consider reasonable

3    alternatives, failed to consider reliance interests, relied on factors which Congress has not

4    intended them to consider, and entirely failed to consider important aspects of the problem.

5        354.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to

6    a declaration that the Charging Program Suspensions are unlawful under the APA. Plaintiff

7    States are further entitled to vacatur of these actions pursuant to 5 U.S.C. § 706; all appropriate

8    preliminary relief under 5 U.S.C. § 705; and a permanent injunction preventing Defendants

9    from maintaining the Charging Program Suspensions, whether through the March Guidance

10   Memo review mechanism or any other implementing action, and including through any new

11   actions to effect equivalent policy.

12

13                              **COUNT V**
14            **Administrative Procedure Act, 5 U.S.C. § 706(1)**
         **Agency Action Unlawfully Withheld and Unreasonably Delayed**
15           **(Against Agency Defendants and the United States)**

16       355.    Plaintiffs incorporate by reference the allegations contained in the preceding

17   paragraphs.

18       356.    The APA authorizes a court to "compel agency action unlawfully withheld or

19   unreasonably delayed." 5 U.S.C. § 706(1).

20       357.    Defendants have a duty to obligate and spend congressionally appropriated

21   funds for the purposes and within the periods established by statute. Defendants have failed to

22   comply with this duty without authorization from Congress.

23       358.    Defendants have thus unlawfully withheld and/or unreasonably delayed agency

24   action under 5 U.S.C. § 706(1) by refusing to obligate appropriated funds for the purposes and

25   within the periods established by statute, without statutory authorization.

26

COMPLAINT                                76

359.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Charging Program Suspensions are unlawful under the APA and that Defendants actions implementing and maintaining the Charging Program Suspensions, including the refusal to fully obligate appropriated funds without statutory authorization, violate the APA because they constitute an unlawful withholding and/or unreasonable delay of agency action.

360.    Plaintiff States are further entitled to an order pursuant to 5 U.S.C. § 706(1) compelling the United States and Defendants to process pending obligation requests, execute pending award agreements, and/or otherwise carry out the CFI and Accelerator programs by obligating the funds appropriated therefor; a permanent injunction preventing Defendants from maintaining the Charging Program Suspensions, whether through the March Guidance Memo review mechanism or any other implementing action; and a permanent injunction against effecting equivalent policy through new action.

**COUNT VI**
**Writ of Mandamus (28 U.S.C. §§ 1361, 1651)**
**(Against Agency Defendants)**

361.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

362.    To the extent no relief is available under the foregoing causes of action, Plaintiff States plead in the alternative that they are entitled to a writ of mandamus ordering Defendants to comply with their statutory and constitutional duties, including to obligate appropriated funds.

363.    Defendants are officers, employees or agencies of the United States. "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

364.    The relief sought as to Defendants is necessary and appropriate to aid in the

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

1  jurisdiction of this Court and agreeable to the usages and principles of law. "The Supreme

2  Court and all courts established by Act of Congress may issue all writs necessary or

3  appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of

4  law." 28 U.S.C. § 1651.

5        365.    Plaintiff States enjoy a clear and indisputable right to relief from the Charging

6  Program Suspensions.

7        366.    Defendants are violating a clear duty to act by refusing to obligate appropriated

8  funds without authorization from Congress.

9        367.    To the extent no relief is available under the foregoing causes of action, no

10  adequate alternative remedy exists to stop the extraordinary and ongoing harms to Plaintiff

11  States being caused by Defendants' violations.

12        368.    Pursuant to 28 U.S.C. §§ 1361, 1651, the Court should issue a writ of

13  mandamus compelling the Defendants to resume the processing of obligation requests, act on

14  pending award agreements, and otherwise resume obligation of CFI and Accelerator funds.

15  **PRAYER FOR RELIEF**

16        WHEREFORE, Plaintiff States pray that this Court grant the following relief:

17        1.    Declare that the Charging Program Suspensions, and any actions to implement

18  them, are unconstitutional and unlawful because they violate the Constitution, the IIJA, and the

19  APA;

20        2.    Permanently enjoin the Defendants, including their agents, and anyone acting in

21  concert or participation with Defendants from implementing, instituting, maintaining, or giving

22  effect to the Charging Program Suspensions by disrupting the required obligation of

23  appropriated funds;

24        3.    Pursuant to 5 U.S.C. § 706, vacate and set aside the January 29 memorandum,

25  "Implementation of Executive Orders Addressing Energy, Climate Change, Diversity, and

26  Gender," the March Guidance Memo, the Charging Program Suspensions, and all actions taken

to maintain or implement them;

    4.    Enter an order pursuant to 5 U.S.C. § 706(1) compelling the defendants to resume obligating the funds that they unreasonably delayed and unlawfully withheld, including by fully obligating the FY2023, FY2024, and FY2025 CFI appropriations before any lapse and by conducting a competitive solicitation that will result in fully obligated awards of the outstanding $700 million FY2026 CFI appropriation before any lapse;

    5.    Issue a writ of mandamus compelling the defendants to fully obligate CFI funds before the applicable appropriations expire;

    6.    Award Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees; and

    7.    Grant other such relief as this Court may deem proper.

Dated:  December 16, 2025             Respectfully submitted,

**ROB BONTA**
Attorney General for the State of California

By: /s/ *Theodore A. McCombs*
THEODORE A. MCCOMBS, Cal. SBN 316243*
Deputy Attorney General
ROBERT SWANSON, Cal. SBN 295159*
Supervising Deputy Attorney General
ELIZABETH JONES, Cal. SBN 326118*
CHRISTOPHER LEN, Cal. SBN 250752*
Deputy Attorneys General
(619) 738-9003
theodore.mccombs@doj.ca.gov
robert.swanson@doj.ca.gov
elizabeth.jones@doj.ca.gov
christopher.len@doj.ca.gov

*Attorneys for the State of California*

1   **PHILIP J. WEISER**
Attorney General for the State of Colorado

2

By: *s/ Sarah H. Weiss*
3   CARRIE NOTEBOOM, CBA #52910*
Assistant Deputy Attorney General
4   SARAH H. WEISS, CBA #61914*
Senior Assistant Attorney General
5   Colorado Department of Law
1300 Broadway, #10
6   Denver, CO 80203
(720) 508-6000
7   carrie.noteboom@coag.gov
sarah.weiss@coag.gov
8

*Attorneys for the State of Colorado*
9

**KRISTIN K. MAYES**
10  Attorney General for the State of Arizona

11  By: */s/ Lauren Watford*
LAUREN WATFORD, SBA #037346*
12  Assistant Attorney General
Arizona Attorney General's Office
13  2005 North Central Avenue
Phoenix, Arizona 85004
14  (602) 542-3333
Lauren.Watford@azag.gov
15

*Attorneys for the State of Arizona*
16

17

18

**BRIAN L. SCHWALB**
19  Attorney General of the District of Columbia

20

By: */s/ Lauren Cullum*
21  LAUREN CULLUM*
Special Assistant Attorney General
22  Office of the Attorney General
for the District of Columbia
23  400 6th Street, N.W., 10th Floor
Washington, D.C. 20001
24  lauren.cullum@dc.gov

25

*Attorneys for the District of Columbia*
26

---

**NICHOLAS W. BROWN**
Attorney General for the State of Washington

By: *s/ Caitlin M. Soden*
CAITLIN M. SODEN, WSBA #55457
LEAH A. BROWN, WSBA #45803
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, Washington 98104
(206) 464-7744
caitlin.soden@atg.wa.gov
leah.brown@atg.wa.gov

*Attorneys for the State of Washington*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: */s/ Vanessa L. Kassab*
IAN R. LISTON, DSBA #5507*
Director of Impact Litigation
RALPH K. DURSTEIN III, DSBA #0912*
VANESSA L. KASSAB, DSBA #5612*
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for the State of Delaware*

**KWAME RAOUL**
Attorney General of the State of Illinois

By: */s/ Katharine Roller*
KATHARINE ROLLER*
Complex Litigation Counsel
R. HENRY WEAVER*
Assistant Attorney General
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 519-1842
katharine.roller@ilag.gov

*Attorneys for the State of Illinois*

---

COMPLAINT        80

1

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

2

By: */s/ Steven J. Goldstein*

3

STEVEN J. GOLDSTEIN, MSBA
#1612130206*

4

Assistant Attorney General
Office of the Attorney General of Maryland

5

200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

6

(410) 576-6414
sgoldstein@oag.state.md.us

7

*Attorneys for the State of Maryland*

8

9

10

11

12

**DANA NESSEL**
Attorney General of the State of Michigan

13

By: */s/ Daniel Ping*

14

DANIEL PING*

15

NEIL GIOVANATTI*
Assistant Attorneys General

16

Michigan Department of Attorney General
525 W. Ottawa

17

Lansing, MI 48909
(517) 335-7603

18

PingD@michigan.gov

19

GiovanattiN@michigan.gov

20

*Attorneys for the State of Michigan*

21

22

23

24

25

26

**ANDREA JOY CAMPBELL**
Attorney General for the Commonwealth of
Massachusetts

By: */s/ Vanessa A. Arslanian*
VANESSA A. ARSLANIAN*
State Trial Counsel
JULIA JONAS-DAY*
Assistant Attorney General
1 Ashburton Pl.
Boston, MA 02108
(617) 963-2107
vanessa.arslanian@mass.gov
julia.jonas-day@mass.gov

*Attorneys for the Commonwealth of
Massachusetts*

**MATTHEW J. PLATKIN**
Attorney General of the State of New Jersey

By: */s/Nell Hryshko*
Nell Hryshko*
Deputy Attorney General
Division of Law
25 Market St., P.O. Box 093
Trenton, NJ 08625
(609) 376-2740
nell.hryshko@law.njoag.gov

*Attorneys for the State of New Jersey*

COMPLAINT                          81

1   **LETITIA JAMES**
    Attorney General of the State of New York
2

3   By: */s/ Kyle Burns*
    KYLE BURNS, NY Atty. Reg. #5589940*
4   Environmental Protection Bureau
    28 Liberty Street
5   New York, NY 10005
    (212) 416-8451
6   Kyle.Burns@ag.ny.gov

7   *Attorneys for the State of New York*

8   **JENNIFER C. SELBER**
    General Counsel
9

10  By: */s/ Jacob B. Boyer*
    JACOB B. BOYER*
11  Deputy General Counsel
    Office of General Counsel
12  30 North Street, Suite 200
    Harrisburg, PA 17101
13  (717) 460-6786
    jacobboyer@pa.gov
14

15  *Attorneys for Governor Josh Shapiro of*
    *Pennsylvania*
16

17  **CHARITY R. CLARK**
    Attorney General of the State of Vermont
18

19  By: */s/ Jonathan T. Rose*
    JONATHAN T. ROSE*
20  Solicitor General
    Office of the Vermont Attorney General
21  109 State Street
    Montpelier, VT 05609
22  (802) 828-3171
    Jonathan.rose@vermont.gov
23

24  *Attorneys for the State of Vermont*

25
    * *pro hac vice application forthcoming*
26

**DAN RAYFIELD**
Attorney General of the State of Oregon

By: */s/ Patrick Rowe*
PATRICK ROWE, OSB #072122*
Senior Assistant Attorney General
100 SW Market Street
Portland, Oregon 97201
(971) 600-8959
Patrick.G.Rowe@doj.oregon.gov

*Attorneys for the State of Oregon*

**PETER F. NERONHA**
Attorney General of the State of Rhode
Island

*/s/ Nicholas M. Vaz*
NICHOLAS M. VAZ, RIBA # 9501*
Special Assistant Attorney General
Office of the Attorney General
Environmental and Energy Unit
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2297
nvaz@riag.ri.gov
*Attorneys for State of Rhode Island*

**JOSHUA L. KAUL**
Attorney General for the State of
Wisconsin

s/ Frances Reynolds Colbert
FRANCES REYNOLDS COLBERT,
Wis. State Bar #1050435*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-9226
frances.colbert@wisdoj.gov

*Attorneys for the State of Wisconsin*

COMPLAINT                          82                    ATTORNEY GENERAL OF WASHINGTON
                                                         Environmental Protection Division
                                                         800 Fifth Avenue STE 2000
                                                         Seattle, WA 98104
                                                         206-464-7744