UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF CALIFORNIA et al.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF TRANSPORTATION et al.,<br><br>Defendants. | CASE NO. 2:25-cv-02574-TL<br><br>ORDER ON MOTION TO COMPLETE THE ADMINISTRATIVE RECORD |

In 2021, Congress passed the Infrastructure Investment and Jobs Act ("IIJA"), Pub. L. No. 117–58, 135 Stat. 429. The statute, among other things, appropriated funds for electric-vehicle ("EV") infrastructure through three programs: the National Electric Vehicle Infrastructure ("NEVI") Formula Program, the Charging and Fueling Infrastructure ("CFI") Discretionary Grant Program, and the Electric Vehicle Charger Reliability and Accessibility Accelerator ("Accelerator") Program. *See* 135 Stat. at 445, 1425. In this case, Plaintiffs challenge the Trump Administration's failure to disburse funds appropriated for the CFI and Accelerator Programs. Plaintiffs allege that, pursuant to a mandate from the White House, the Defendant–

Agencies have adopted and implemented a policy that has indefinitely suspended the funding of these programs—what Plaintiffs categorize as an arbitrary and capricious funding freeze that violates the Administrative Procedure Act ("APA").

In evaluating the validity of an agency decision under the APA, the Court must consider "the full administrative record that was before the [agency] at the time [it] made [its] decision." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Plaintiffs assert that Defendants have not submitted the full administrative record ("AR") for the Court's review and have filed a Joint Motion to Complete the Administrative Record. Dkt. No. 54. Having considered the motion, Defendants' response (Dkt. No. 59), Plaintiffs' reply (Dkt. No. 61), and the relevant record, the Court GRANTS IN PART and DENIES IN PART the motion.

## I. BACKGROUND

### A. Substantive Background

This case concerns the Trump Administration's "pause" of the disbursement of funds for EV infrastructure. Upon taking office in January 2025, the President issued an executive order requiring agencies to

> pause the disbursement of funds appropriated through the . . . Infrastructure Investment and Jobs Act (Public Law 117–58), including but not limited to funds for electric vehicle charging stations made available through the National Electric Vehicle Infrastructure Formula Program and the Charging and Fueling Infrastructure Discretionary Grant Program.

Exec. Order No. 14154 ("Unleashing American Energy"), 90 Fed. Reg. 8353, 8357 (Jan. 29, 2025); *see* IIJA, Pub. L. No. 117–58, 135 Stat. 429, 1425 (2021).

This is the second case challenging that "pause." In the first, *Washington v. Department of Transportation*, No. C25-848, 2026 WL 183584 (W.D. Wash. Jan. 23, 2026) (order granting

summary judgment), 20 states, the District of Columbia, and seven public interest organizations challenged the Administration's freezing of funds appropriated for the NEVI Formula Program.

In the instant case, 16 states and the District of Columbia (together, "Plaintiff States"), and three public interest organizations[1] ("Plaintiff Organizations") challenge the alleged freezing of funds appropriated by Congress for the CFI Discretionary Grant Program and the EV Charger Accelerator Program. As alleged by Plaintiffs, the Administration, acting through Defendants Department of Transportation ("DOT") and the Federal Highway Administration ("FHWA"), has frozen the programs by "indefinitely postpon[ing], reduc[ing], or cancel[ing] awards based on the policy preferences the President expressed in his executive orders." Dkt. No. 1 (States' Complaint) ¶ 80; *see* Complaint ("Organizations' Complaint") ¶ 6, *Climate Solutions v. U.S. Dep't of Transp.*, No. C25-2578 (W.D. Wash. Dec. 16, 2025), Dkt. No. 1.

Plaintiff States allege that "all unobligated or partially unobligated CFI and Accelerator awards in Plaintiff States . . . remain[] suspended in . . . limbo[.]" Dkt. No. 1 ¶ 7. This reflects Plaintiffs' contention that projects that were intended to be funded by CFI and Accelerator grants have been placed under an indefinite and—as Plaintiff States allege—poorly explained "review for consistency with the President's executive orders and USDOT directives to implement those orders." *Id.* ¶ 5. Plaintiff States allege that the indefinite review, which precludes disbursement of funds, amounts to a categorical suspension and an unlawful impoundment of the appropriated funds. *See id.* ¶ 210. Especially relevant to this case, Plaintiff States allege that "Defendants have never publicly explained their actions suspending the CFI and Accelerator grant programs[.]" *Id.* ¶ 5.

[1] Plaintiff States are California, Colorado, Washington, Arizona, Delaware, the District of Columbia, Illinois, Maryland, Massachusetts, Michigan, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Wisconsin; the Plaintiff public interest organizations are Climate Solutions, Sierra Club, and the Natural Resources Defense Council. "Plaintiffs" refers collectively to all Plaintiff States and all Plaintiff Organizations

**B. Procedural Background**

On December 12, 2025, Plaintiff States filed their Complaint against DOT, FHWA, and the respective chief officers of those agencies. Dkt. No. 1. On December 16, 2025, the Plaintiff Organizations filed a separate complaint. *See* Organizations' Complaint. On February 11, 2026, the two cases were consolidated into a single action. Dkt. No. 48 (Order on Consolidation).

On March 11, 2026, Defendants filed the administrative record with the Court. Dkt. No. 51 (notice); Dkt. No. 51-1 (AR).

On March 31, 2026, Plaintiffs filed the instant motion to complete the administrative record.[2] Dkt. No. 54.

## II. Legal Standard

"Under the Administrative Procedure Act ('APA'), the Court is directed to 'review the whole record or those parts of it cited by a party.'" *Oceana, Inc. v. Ross* [*Oceana I*], 290 F. Supp. 3d 73, 77 (D.D.C. 2018) (quoting 5 U.S.C. § 706). In this context, the "whole record" means "the full administrative record that was before the [agency] at the time [it] made [its] decision." *Overton Park*, 401 U.S. at 420. The Ninth Circuit has observed that "[t]he whole administrative record . . . 'is not necessarily those documents that the *agency* has compiled and submitted as "the" administrative record.'" *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (quoting *Exxon Corp. v. Dep't of Energy*, 91 F.R.D. 26, 32 (N.D. Tex. 1981)). Rather, "[t]he 'whole' administrative record . . . consists of all documents and materials directly or

---

[2] The Court regrets the amount of time it has taken to reach this motion. Between January and August 2026, the Western District of Washington received over 1,150 habeas corpus petitions filed by individuals in immigration detention, compared to 51 in the same period in 2025. A petition for writ of habeas corpus is uniquely urgent, as it is "entitled by statute to special, preferential consideration to [e]nsure expeditious hearing and determination." *Van Buskirk v. Wilkinson*, 216 F.2d 735, 737–38 (9th Cir. 1954). "The application for the writ usurps the attention and displaces the calendar of the judge or justice who entertains it and receives prompt action from [her] within the four corners of the application." *Yong v. I.N.S.*, 208 F.3d 1116, 1120 (9th Cir. 2000) (quoting *Ruby v. United States*, 341 F.2d 585, 587 (9th Cir. 1965)). Also, more than 500 more non-prisoner civil cases were filed between January and August 2026 than during the same period in 2025.

*indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position." *Id.* (quoting *Exxon*, 91 F.R.D. at 33).

"An agency is 'entitled to a strong presumption of regularity that it properly designated the administrative record,'" *Oceana I*, 290 F. Supp. 3d at 77 (quoting *Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps. of Eng'rs*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006)), and the Court "place[s] a thumb on the scale against supplementation of the AR," *Blue Mountains Biodiversity Project v. Jeffries*, 99 F.4th 438, 446 (9th Cir. 2024). Put differently, Courts "presume that an 'agency properly designated the Administrative Record absent clear evidence to the contrary.'" *Goffney v. Becerra*, 995 F.3d 737, 748 (9th Cir. 2021) (quoting *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993)).

"[A] plaintiff may seek to add evidence or documents to the administrative record" in two situations. *Oceana I*, 290 F. Supp. 3d at 77. "First, a plaintiff may seek to include 'extra-judicial evidence that was not initially before the agency' but that the plaintiff 'believes should nonetheless be included in the administrative record." *Id.* (quoting *Univ. of Colo. Health at Mem'l Hosp. v. Burwell*, 151 F. Supp. 3d 1, 13 (D.D.C. 2015)). "Second, a plaintiff may seek to include 'evidence that should have been properly a part of the administrative record but was excluded by the agency.'" *Id.* (quoting *Univ. of Colo.*, 151 F. Supp. 3d at 13). *See also WildEarth Guardians v. Bernhardt*, 507 F. Supp. 3d 1219, 1222 n.3 (C.D. Cal. 2020) ("'supplementing the record' refers to including 'materials which were not considered by the agency, but which are necessary for the court to conduct a substantial inquiry' whereas 'completing the record' refers to including 'materials which were actually considered by the agency, yet omitted from the administrative record'") (quoting *Bruce v. Azar*, 389 F. Supp. 3d 716, 724 n.5 (N.D. Cal. 2019)).

It is the second situation that is relevant to this motion. *See* Dkt. No. 54 at 11. "[T]o add evidence that is properly part of the record but was excluded[,] [a plaintiff] must . . . 'put forth

concrete evidence' and 'identify reasonable, non-speculative grounds for [their] belief that the documents were considered by the agency and not included in the record.'" *Oceana I*, 290 F. Supp. 3dat 78–79 (quoting *Charleston Area Med. Ctr. v. Burwell*, 216 F. Supp. 3d 18, 23 (D.D.C. 2016)) .

## III. Discussion

### A. "Threshold Matter"

Before discussing the merits of Plaintiffs' motion, Defendants argue that no "final agency action has occurred here and thus no AR is required." Dkt. No. 59 at 11. Defendants' position is that this case is not properly before the Court, because what Plaintiffs are challenging is not subject to APA review. *See id.* Defendants concede, however, that they "voluntarily agreed to produce an AR to expedite resolution of this matter." *Id.* The Court will presume that Defendants made this agreement in good faith—that is, when Defendants agreed to produce the AR, they agreed to produce the *whole* AR, as defined in *Overton Park* (that is, "the full administrative record that was before the [agency] at the time [it] made [its] decision[,]" 401 U.S. at 420), and as clarified by *Thompson*, 885 F.2d at 555.

### B. Challenged Action

Relatedly, there seems to be a fundamental disconnect between the Parties over the parameters of the agency action at issue in this case. Defendants appear to conceive of the issue before the Court as consisting of hundreds of individual decisions on individual CFI or Accelerator Program grants. *See* Dkt. No. 59 at 11; *see* Dkt. No. 54 at 5; Dkt. No. 51-1 at 27–34, 39–61, 67–87 (listing projects). In Defendants' conception of the case, each of these decisions represents an independent agency action; no coordination or centralized framework—no overarching decision—exists that would demonstrate that one action on a specific grant is related to another. *See id.* at 12. In contrast, Plaintiffs' position is that Defendants, prior to rendering the

individual CFI or Accelerator Program grant decisions, made one global decision that froze CFI and Accelerator Program grant funding. *See* Dkt. No. 61 at 1 ("Plaintiffs seek materials by which the agency rendered, implemented, and communicated the freeze during an indefinite review."). Plaintiffs characterize the challenged action as Defendants' "decision to 'hold' obligations during an indefinite review." *Id.*

The Court agrees with Plaintiffs. For one thing, beyond a short preface to their opposition to the instant motion, Defendants do not present a complete argument to substantiate their position. For another, the case before the Court is premised on Plaintiffs' pleading. In their Complaint, Plaintiff States allege that "Defendants' actions to suspend the CFI and Accelerator programs stem from a unified policy directive." Dkt. No. 1 ¶ 6. It is this "unified policy directive"—or the Charging Program Suspensions—that Plaintiffs are challenging in this case. *Id*. ¶¶ 5, 6. Plaintiff States describe executive instructions to "halt disbursement" and "paus[e] 'all activities related to obligation or disbursement[.] *Id.* ¶¶ 212–213. Plaintiff States allege that Defendant FHWA "refused to obligate . . . funds . . . as part of a deliberate policy to freeze, suspend, and defund the unobligated portions of CFI awards supported by th[e] appropriation" in the IIJA. *Id.* ¶ 8. In other words, prior to any disbursement or nondisbursement of funds for any particular project, there was a decision—a "unified policy directive"—that determined how those disbursements or nondisbursements would go.

With this framework in mind, the Court now turns to the substance of the motion before it.

**C. Deliberative Process Privilege**

Defendants assert that many of the records that Plaintiffs seek to add to the AR are protected by the deliberative process privilege and are thus immaterial. *See* Dkt. No. 59 at 5, 9 (citing *In re Subpoena Duces Tecum Served on Off. of Comptroller of Currency*, 156 F.3d 1279,

1279 (D.C. Cir. 1998) ("Agency deliberations not part of the record are deemed immaterial.")). "The deliberative process privilege protects the internal decision making processes of government agencies, including 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Am. Civ. Liberties Union of N. Cal. v. U.S. Dep't of Justice*, 880 F.3d 473, 490 (9th Cir. 2018) (quoting *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)). "The purpose of the privilege is 'to promote frank and independent discussion among those responsible for making governmental decisions and also to protect against premature disclosure of proposed . . . policies or decisions.'" *N. Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1121 (N.D. Cal. 2003) (quoting *F.T.C. v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984)). But "the privilege does not protect documents that 'follow a final decision and are designed to explain a decision already made.'" *Sea Shepherd Legal v. Nat'l Oceanic & Atmospheric Admin.*, 516 F. Supp. 3d 1217, 1231 (W.D. Wash. 2021) (quoting *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 981 (9th Cir. 2009)).

**D. Records Sought**

Plaintiffs identify numerous records and classes of records that, they argue, must be added to the AR. *See* Dkt. No. 54-1 (Plaintiffs' Proposed Order) at 2–4.[3] The Court will discuss them in turn.

//

//

//

//

[3] For ease of reference, the Court will utilize the same listing convention that Plaintiffs use in Paragraph 2 of their Proposed Order. *See* Dkt. No. 54-1 at 2–4.

**a. Documents dated January 20, 2025, or later providing any direction to review, pause, hold, freeze, suspend, postpone, or reject (1) obligations of grant funds; (2) contracting processes with awardees, including execution of award agreements or amendments; or (3) release of new funding opportunities, under the Charging and Fueling Infrastructure (CFI) and Discretionary Grant and Electric Vehicle Charger Reliability and Accessibility Accelerator (Accelerator) programs.**

**(1) Executive Order No. 14154, "Unleashing American Energy"**

Executive Order No. 14154 ordered "[a]ll agencies [to] immediately pause the disbursement of funds appropriated through the . . . Infrastructure Investment and Jobs Act (Public Law 117–58), including but not limited to funds for electric vehicle charging stations made available through the . . . Charging and Fueling Infrastructure Discretionary Grant Program[.]"

Defendants argue that the Executive Order "is immaterial, because Defendants' ongoing review of unobligated grant selections is not a 'pause' directed by EO 14154." Dkt. No. 59 at 12. This is unpersuasive. As evidenced by the record, Defendants did, in fact, implement a "pause," and did so as either a direct or indirect result of the Executive Order. In an email dated February 28, 2025, FHWA Vermont Division advised the Burlington Electric Department that "OMB Memo M-25-13 directs agencies to, 'temporarily *pause* all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders." Dkt. No. 55-5 at 10 (emphasis added). A March 11, 2025, email advised that "operating status [on] all discretionary grant actions is *on pause*." *Id.* at 9 (emphasis added). And in an email dated September 8, 2025, FHWA Ohio Division advised the City of Cincinnati that "the CFI program has not been released from administrative review to allow obligation of any CFI funding, at this time." Dkt. No. 56-1 at 2. "Release" implies that the

program has, to some degree, been "captured" which, combined with the language of the Executive Order, suggests a process that goes beyond mere "review."

Executive Order No. 14154 belongs in the AR.

**(2) White House Office of Management & Budget ("OMB") Memorandum M-25-11**

Plaintiffs describe OMB Memorandum M-25-11 as one of "several memoranda interpreting and applying the *Unleashing* Executive Order to federal grant programs supporting greenhouse gas reductions, EVs, and EV charging infrastructure." Dkt. No. 54 at 7. Defendants assert that "[t]his memorandum played no part in Defendants' decision-making process because it detailed implementation of the "pause" described in EO 14154." Dkt. No. 59 at 12. But if the Executive Order's pause applied to the CFI and Accelerator programs—and the evidence cited above indicates that Defendants believed that it did—then a record that detailing Defendants' decision to implement the pause within their agencies, and to the specific programs at issue in this case, would be part of the AR here. As discussed above, the Charging Suspension Program—or the "implementation of the 'pause' described in EO 14154"—is the action that Plaintiffs are challenging in this case. *See supra* Section III.B. A document that "detail[s]" that implementation of the Charging Program Suspensions is necessarily part of the AR of that action, because it enables the Court to adequately assess Plaintiffs' challenge to the legality of the Defendants' actions. *See, e.g.*, *Urban Sustainability Dirs. Network v. U.S. Dep't of Agric.*, No. C25-1775, 2026 WL 1500832, at *8 (D.D.C. May 29, 2026) ("No matter how vigorously defendants deny the alleged policy implementation claims, they must produce in the administrative record documentation surrounding the implementation of defendants' policy directives to enable assessment of plaintiffs' challenge to the legality of agency actions in terminating grants.").

OMB Memorandum No. M-25-11 belongs in the AR.

**(3) U.S. Department of Transportation (USDOT) Office of the Assistant Secretary of Transportation Policy (OST-P)'s January 29, 2025, memorandum "Implementation of Executive Orders Addressing Energy, Climate Change, Diversity, and Gender"**

Plaintiffs describe this record as a "USDOT internal memo, 'Implementation of Executive Orders Addressing Energy, Climate Change, Diversity, and Gender.'" Dkt. No. 54 at 7. Defendants argue that "[t]his memorandum laid out initial steps for implementing multiple Executive Orders in the first month of the Administration. But it did not govern DOT's unobligated grant selection review process." Dkt. No. 59 at 13. Plaintiffs, however, have challenged the pause, as ordered in the "Unleashing" Executive Order. And as discussed above, the "Unleashing" Executive Order specifically ordered an "immediate[] pause" on the disbursement of funds that are at issue in this case. *See* 90 Fed. Reg. at 8357. A discussion of "initial steps for implementing [the] Executive Order[]"—including, presumably, the "pause" that that Executive Order mandates—is part of the AR regarding the Charging Program Suspension.

The January 29, 2025, memorandum titled "Implementation of Executive Orders Addressing Energy, Climate Change, Diversity, and Gender" belongs in the AR.

**(4) OST-P memorandum issued on or about March 11, 2025, setting out guidance on competitive award selections made after January 20, 2021, that do not have fully obligated grant agreements or cooperative agreements in place**

Plaintiffs assert that this memo "directs actions to 'comply with current Administration priorities and Executive Orders,' including *Unleashing American Energy*, DOT Order 2100.7, and the January 29 memorandum." Dkt. No. 54 at 7. Defendants describe the memo as an "unpublished version of a non-public DOT memo [that] directs DOT employees to begin a

review process for various unobligated grant selections." Dkt. No. 59 at 13. It consists of "predecisional information [that] provides internal guidance on a process that would conclude with DOT leadership ultimately deciding what final action, if any, the agency would take." *Id.* Ultimately, Defendants argue, the memo is "protected under the deliberative process privilege, does not qualify for inclusion in the administrative record and is deemed 'immaterial.'" *Id.*

Again, Defendants misconceive the challenged action. As alleged, the "review process" is the vehicle by which Defendants effectuated within their agencies the "pause" mandated in the Executive Order. *See* Dkt. No. 1 ¶¶ 77–84. The memorandum that: (1) instructed Defendants to take the action that has now been challenged in court; and (2) provided parameters as to what shape that action might take, is part of the AR. It describes what the "pause" will look like, and it was almost certainly "before" the Defendant–Agencies when they made the decision to pause disbursements. This is borne out by the record. As documents in the existing AR demonstrate, Defendants disagreed with the process by which the previous administration had reviewed grants. They sought to change it by, among other things, removing certain requirements that had previously governed grant approvals. *See, e.g.*, Dkt. No. 51-1 at 24. That change—for example, the "ripp[ing] out [of] burdensome DEI, Green New Scam, and social justice requirements"—and not the individual decisions made pursuant to that change, is the subject of this lawsuit. The records that document the implementation of that change to the program (versus the application of the change to individual grant requests) must be included in the AR. *See, e.g.*, *Urban Sustainability Dirs. Network*, 2026 WL 1500832, at *8.

The OST-P memorandum issued on or about March 11, 2025, belongs in the AR.

//

//

//

**(5) Any other instructions, directives, memoranda, or guidance from the White House, OMB, USDOT, OST-P, or Federal Highway Administration (FHWA)'s headquarters that suspend CFI and Accelerator programs, as described in paragraph 2(a), or communications thereof, including those that address:**

i. Implementation of Executive Order 14154, OMB M-25-11, DOT Order 2100.7, OST-P's January 29, 2025, memorandum "Implementation of Executive Orders Addressing Energy, Climate Change, Diversity, and Gender", and OST-P's memorandum issued on or about March 11, 2025;

ii. Review of CFI and Accelerator award selections;

iii. Review of the CFI and Accelerator programs;

iv. The relationship between the review of the CFI and Accelerator award selections and the "hold" or "pause" of the programs described in FHWA division offices' communications to awardees;

v. Decisions, instructions, or directives to USDOT or FHWA staff on how to communicate the status of the CFI and Accelerator programs and grants to applicants and awardees

The Court rejects Defendants' position that "[a]ny such documents in this category are covered by the deliberative process privilege" (Dkt. No. 59 at 14). The records described do not represent "opinions, recommendations and deliberations," *ACLU*, 880 F.3d at 490.

But even so, the requested categories of documents are too broad and too vaguely defined. As courts often repeat when considering the adequacy of an AR, "the administrative record before an agency does not include 'every scrap of paper that could or might have been created.'" *Ctr. for Biological Diversity v. Wolf*, 447 F. Supp. 3d 965, 973 (D. Ariz. 2020) (quoting *Pinnacle Armor, Inc. v. United States*, 923 F. Supp. 2d 1226, 1237 (E.D. Cal. 2013)). Plaintiffs' broad request for "[a]ny other instructions, directives, memoranda, or guidance . . . that address . . ." is insufficiently dissimilar to an "any scrap of paper" dragnet. Item (iii), for

example, seeks "instructions, directives, memoranda, or guidance . . . that address . . . [the] [r]eview of the CFI and Accelerator programs." Beyond the request's inclusion of four kinds of records, two words in particular—*address* and *review*—are sufficiently broad that they conceivably sweep any document that merely mentions the programs at issue, however obliquely, into the AR.

"Courts routinely reject requests that, like plaintiffs', seek broad categories of information." *Sakr v. City of Portland*, 821 F. Supp. 3d 1237, 1257 (D. Or. 2026); *see Xerces Soc'y for Invertebrate Conserv. v. Shea*, 682 F. Supp. 3d 948, 955 (D. Or. 2023) (holding that plaintiffs did not meet their burden to overcome the presumption of completeness where they did not identify particular documents that should be included in the record). The Court recognizes the difficult situation in which Plaintiffs find themselves—they are required to "identify the materials allegedly omitted from the record with sufficient specificity," *Oceana I*, 217 F. Supp. at 316 (quoting *Dist. Hosp. Partners, L.P. v. Sebelius*, 971 F. Supp. 2d 15, 20 (D.D.C. 2013)), even though omission is, in and of itself, evidence of the materials' nonexistence. But courts in this Circuit and the D.C. Circuit have routinely held plaintiffs to this high standard. *See, e.g.*, *id.* at 316–17 (disapproving of "merely proffering broad categories of documents and data that are likely to exist as a result of other documents that are included in the administrative record" (citation modified)); *Blue Ocean Inst. v. Gutierrez*, 503 F. Supp. 2d 366, 369–70 (D.D.C. 2007) (rejecting plaintiff's arguments that "because there are certain documents in the administrative record, it follows that there must have been discussions and analyses of the issues raised by those documents," and that "[t]hose analyses and the notes of those discussions, whether occurring in person or through email or by phone, must also exist and be placed in the administrative record"); *cf. Xerces Soc'y*, 682 F. Supp. 3d at 957 (finding request for "specific types of documents received by [the agency] during limited time periods" to be sufficiently specific).

Although the Court is sympathetic to Plaintiffs' position that these materials might, in fact, exist (*see, e.g.*, Dkt. No. 61 at 6), Plaintiffs have not met their burden to establish what, in particular, has been improperly excluded.[4]

Further, identifying missing records is only part of Plaintiffs' burden here. They must also "show that the document in question was so heavily relied on in the recommendations that the decision maker constructively considered it." *Sakr*, 821 F. Supp. 3d at 1257 (citation modified). Here, Plaintiffs have failed to meet their burden of showing "with clear evidence the context in which materials were considered by decision makers in the relevant decision making process." *Wildearth Guardians v. U.S. Forest Serv.*, 713 F. Supp. 2d 1243, 1256 (D. Colo. 2010).

**(6) Any FHWA communications included in the Complaints that are between FHWA and CFI and Accelerator applicants and awardees implementing or communicating the "hold" or "pause" of CFI and Accelerator awards, agreements or amendments, obligation requests, and funding opportunities**

The Court is unclear as to which records Plaintiffs are referring. Certainly, the pleadings in this case *reference* communications between FHWA and applicants and awardees (*see, e.g.*, Dkt. No. 1 ¶¶ 116, 118 (quoting emails between "an FHWA official based in Chicago" and the Illinois Environmental Protection Agency and between "an FHWA official" and "all Illinois CFI grantees"), but these communications are not *included* as attachments or cited beyond brief excerpts. Moreover, as discussed above, the issue in this case is the Defendant–Agencies' decision to pause the disbursement of funds. Communications that merely inform recipients

[4] In other cases, Plaintiffs have utilized the Freedom of Information Act ("FOIA") to specifically identify records that should have been included within the administrative record. *See, e.g.*, *Ctr. for Food Safety v. Perdue*, No. C20-256, 2021 WL 8532247, at *4 (N.D. Cal. Nov. 5, 2021) ("The [allegedly omitted] documents are records responsive to two FOIA requests . . . ."); *Friends of the Clearwater v. Higgins*, 523 F. Supp. 3d 1213, 1226 (D. Idaho 2021) (seeking to complete the AR with a "document . . . provided by Defendants in response to Plaintiffs' FOIA request, but was not included in the administrative record"); *Sierra Club v. Zinke*, No. C17-7187, 2018 WL 3126401, at *4 (N.D. Cal. June 26, 2018) ("[Plaintiffs] contend that certain documents they received from their FOIA requests are relevant to the decision but are not included in the record[.]").

about a decision that has already been made could not have been before the agencies at the time they made their decision.

**b. Documents implementing the review process described in the Lefevre Declaration**

**(1) Documents establishing the committee of USDOT employees that "met regularly" to review grant selections and establishing the committee's membership**

The "Lefevre Declaration" (Dkt. No. 51-1) is a sworn statement made by Maria Lefevre, Executive Director for the Office of the Under Secretary of Transportation for Policy at DOT. Dkt. No. 51-1 at 4 ¶ 1. It is included within the AR provided by Defendants. *Id.* at 4–9. In the Declaration, Lefevre describes "a committee of DOT employees [that] met regularly to review grant selections for consistency with the statutes governing the relevant grant programs and for overall consistency with the Administration's policy priorities." *Id.* at 6 ¶ 11. As discussed above, the "Unleashing" Executive Order mandated the "pause" that forms the basis of Plaintiffs' complaints. *See* 90 Fed. Reg. at 8357. Moreover, as the Vermont example, discussed above, shows, what Lefevre labels a "review process" was, in fact, synonymous with—and was, for that matter, understood by DOT employees as actually being—"pause." And where such a pause was expressly ordered by the President, "reviewing grant selections for . . . overall consistency with the Administration's policy priorities" is synonymous with the implementation of the pause.

Although the deliberations of this committee regarding each individual grant selection are not part of the relevant AR here, records regarding the committee's establishment and policy—in effect, the committee's marching orders—are. As explained by Lefevre, this committee was the vehicle by which Defendants implemented within their agencies the pause on the disbursement of funds.

Defendants assert that "[a]ny such documents are limited to calendar invitations and internal emails discussing the committee's work." Dkt. No. 59 at 15. They assert further that these records "are protected by the deliberative process [privilege] because they include materials like instructions for evaluating unobligated grant selections, updates on the status of the ongoing review, or information about next steps DOT was considering for unobligated grant selections after review." *Id.* But "instructions for evaluating unobligated grant selections" are relevant here. These "instructions" represent the implementation of the challenged action—i.e., the pause—within the Defendant–Agencies. Records related to the committee's work, as they relate to individual decisions on grants, might encompass deliberative materials, but records that discuss the pause on disbursements—and how to apply such a pause *to* the individual decisions on grants—contain information that was before the Defendants and is related to the larger decision that Plaintiffs are challenging.

Therefore, the "Documents establishing the committee of USDOT employees that 'met regularly' to review grant selections and establishing the committee's membership belong in the AR.

**(2) Documents establishing the scope of the committee's review and its criteria for judging "consistency with governing statutes" and "overall consistency with the Administration's policy priorities"**

**(3) Documents directives and guidance concerning the "identif[ication]" and "remov[al]" of "extraneous grant requirements" from agreements**

Similarly, the documents in these two categories informed Defendants' decision regarding its implementation of the pause mandated by the Executive Order and the Charging Program Suspensions. Accordingly, these records are not deliberative and belong in the AR.

**(4) Minutes recording the committee's decisions**

Defendants assert that, "Based on a reasonable search, no such documents exist." Dkt. No. 59 at 16. The Court accepts Defendants' assertion on its face, pursuant to Federal Rule of Civil Procedure 11. But even if such documents did exist, they represent records that were produced *after* the decision to pause the disbursements—i.e., the decision now under review—was made. These records were therefore not "before" the agencies when they made the decision under review here. In her declaration, Lefevre avers that "DOT initiated an internal review of fully or partially unobligated grant selections, including the selections identified in Plaintiffs' complaints and other discretionary grant selections." Dkt. No. 51-1 at 6 ¶ 10. The implementation of the "pause" was the *formation* of the committee and the provision of its marching orders, not the deliberations and decisions made by the committee. As Lefevre asserts, the committee "met regularly to review grant selections for consistency with the statutes governing the relevant grant programs and for overall consistency with the Administration's policy priorities." *Id.* ¶ 11. Presumably, these "policy priorities" were communicated to members of the committee and informed their work. It is the decision to mandate of one of these policy priorities—as alleged, to defund EV infrastructure projects—that is at issue in this case. Thus, minutes recording the committee's decisions would appear to be deliberative records that indicate how Defendants evaluated each project's viability against the framework they established when implementing the pause. As such, these records are properly omitted from the AR, because they are ultimately deliberative documents that are informative of Defendants' decisions regarding the individual projects, not the decision to subject them to review in the first place.

**(5) Any lists or tables generated by the committee of the grants or grant requests subject to committee review**

These records represent documents produced during the process of "review[ing] grant selections for consistency with the statutes governing the relevant grant programs and for overall consistency with the Administration's policy priorities." Dkt. No. 51-1 at 6 ¶ 11. As discussed above, the challenged action here is, essentially, the determination and implementation of at least one of those "policy priorities." The policy priority, that is, had already been decided upon when these "lists or tables" were created. Put another way, these records were not before the agency when it made its decision. Rather, the decision was made and, subsequently, these records were generated in response to that decision and reflect the application of the challenged policy to individual grant requests.

**(6) Documents identifying when and how the committee was concluded**

**(7) Documents identifying who or what body is continuing the review process, and the directives or guidance by which this body is continuing its work**

Again, the documents in these two categories define *how* Defendants implemented the pause. The implementation of an action encompasses the procedure for wrapping it up, as well as the procedure for its continuation, if necessary. Therefore, these records belong in the AR.

**E. Privilege Log**

Plaintiffs request that, should Defendants exclude or withhold any documents that the Court has ordered be included in the AR, the Court order Defendants to "provide a privilege log that identifies each document for which a privilege or work product protection is claimed, its author, its recipients, date of preparation, and the specific privilege or work product protection claimed." Dkt. No. 54-1 at 4. Defendants argue that Plaintiffs' request is improper, because

documents omitted from the AR on the basis of the deliberative process privilege "are 'not part of the administrative record to begin with,' [and are] 'not required to be placed on a privilege log.'" Dkt. No. 59 at 18 (quoting *Blue Mountains*, 99 F.4th at 445).

As to the deliberative process privilege, the Court agrees with Defendants. In this Order, the Court has rejected Defendants' invocation of the deliberative process privilege for certain classes of records and accepted it for others. Accordingly, the Court expects Defendants to abide by the Court's decision and include the appropriate documents in a supplemented AR. The D.C. Circuit has held that "[r]ather than submitting a privilege log, on APA review, the agency must submit '[p]roper certification' that the record is complete, which serves as 'formal representation by the [agency]' that it duly evaluated all predecisional documents before excluding them from the record." *Oceana, Inc. v. Ross* [*Oceana II*], 920 F.3d 855, 865 (D.C. Cir. 2019) (quoting *Norris & Hirschberg v. Secs. & Exch. Comm'n*, 163 F.2d 689, 694 (D.C. Cir. 1947)). And the Ninth Circuit has endorsed this position. *See Blue Mountains*, 99 F.4th at 444. However, "'a showing of bad faith or improper behavior' might justify production of a privilege log to allow the district [court] to determine whether excluded documents are actually deliberative." *Id.* at 445 (quoting *Oceana II*, 920 F.3d at 865). Even so, Plaintiffs have not made such a showing in their motion.

As to the assertion of any other privilege, however, Defendants must produce a privilege log "for materials that would otherwise have been a part of the administrative record but were withheld on the basis of privilege or the attorney work-product doctrine." *Thrive Hood River v. Loftsgaarden*, No. C22-1981, 2025 WL 689496, at *2 (D. Or. Jan. 6, 2025). The Court agrees with the *Thrive Hood River* court that there is a distinction between documents omitted or excluded from the administrative record because they are deliberative, and documents that are withheld from the administrative record because they are subject to a different privilege or the

attorney work product doctrine. Absent contravening authority from the Ninth Circuit, the Court will require a privilege log for records withheld on bases other than the deliberative process privilege.

## IV. Conclusion

Accordingly, Plaintiffs' motion to complete the administrative record (Dkt. No. 54) is GRANTED IN PART and DENIED IN PART. It is hereby ORDERED:

(1) Defendants SHALL add the following records to the Administrative Record:

(a) Executive Order No. 14154;

(b) OMB Memorandum No. M-25-11;

(c) U.S. Department of Transportation (USDOT) Office of the Assistant Secretary of Transportation Policy (OST-P)'s January 29, 2025, memorandum "Implementation of Executive Orders Addressing Energy, Climate Change, Diversity, and Gender";

(d) OST-P memorandum issued on or about March 11, 2025, setting out guidance on competitive award selections made after January 20, 2021, that do not have fully obligated grant agreements or cooperative agreements in place;

(e) Documents establishing the committee of USDOT employees that "met regularly" to review grant selections and establishing the committee's membership

(f) Documents establishing the scope of the committee's review and its criteria for judging "consistency with governing statutes" and "overall consistency with the Administration's policy priorities"

(g) Documents directives and guidance concerning the "identif[ication]" and "remov[al]" of "extraneous grant requirements" from agreements;

(h) Documents identifying when and how the committee was concluded;

(i) Documents identifying who or what body is continuing the review process, and the directives or guidance by which this body is continuing its work.

(2) Defendants SHALL provide Plaintiffs with a privilege log that includes entries for all materials excluded from the administrative record on the basis of any privilege

or doctrine other than the deliberative-process privilege, such as attorney-client privilege or the attorney work product doctrine.

Dated this 15th day of September 2026.

Tana Lin
United States District Judge